UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 09-21010-CR-MARTINEZ**

**UNITED STATES OF AMERICA**

**vs.**

**JOEL ESQUENAZI and
CARLOS RODRIGUEZ,**

**Defendants.**

_____/

## COURT'S FINAL INSTRUCTIONS TO THE JURY

Members of the Jury:

It's my duty to instruct you on the rules of law that you must use in deciding this case. After I have completed these instructions you will go to the jury room and begin your discussions - what we call your deliberations.

You must decide whether the Government has proved the specific facts necessary to find a Defendant guilty beyond a reasonable doubt.

1

Your decision must be based only on the evidence presented during the trial. You must not be influenced in any way by either sympathy for or prejudice against the Defendant or the Government.

You must follow the law as I explain it—even if you do not agree with the law; and you must follow all of my instructions as a whole. You must not single out or disregard any of the Court's instructions on the law.

The indictment or formal charge against a Defendant isn't evidence of guilt. The law presumes every Defendant is innocent. A Defendant does not have to prove his innocence or produce any evidence at all. A Defendant does not have to testify, and if a Defendant chose not to testify, you cannot consider that in any way while making your decision. The Government must prove guilt beyond a reasonable doubt. If it fails to do so, you must find the Defendant not guilty.

The Government's burden of proof is heavy but it doesn't have to prove a Defendant's guilt beyond all possible doubt. The Government's proof only has to exclude any "reasonable doubt" concerning the Defendant's guilt.

A "reasonable doubt" is a real doubt, based on your reason and common sense after you've carefully and impartially considered all the evidence in the case.

"Proof beyond a reasonable doubt" is proof so convincing that you would be willing to rely and act on it without hesitation in the most important of your own affairs. If you are convinced that the Defendant has been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

As I said before, you must consider only the evidence that I have admitted in the case. Evidence includes the testimony of the witnesses, the exhibits admitted, and any stipulations entered into by the parties. But anything the lawyers say is not evidence and isn't binding on you.

You shouldn't assume from anything I've said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions. You shouldn't be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eye witness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There's no legal difference in the weight you may give to either direct or circumstantial evidence.

When I say you must <u>consider</u> all the evidence, I don't mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. The number of witnesses testifying concerning a particular point doesn't necessarily matter.

To decide whether you believe any witness I suggest that you ask yourself a few questions:

- Did the witness impress you as one who was telling the truth?

- Did the witness have any particular reason not to tell the truth?

- Did the witness have a personal interest in the outcome in the case?

- Did the witness seem to have a good memory?

- Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

- Did the witness appear to understand the questions clearly and answer them directly?

- Did the witness's testimony differ from other testimony or other evidence?

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask whether there was evidence that at some other time a witness said or did something, or didn't say or do something, that was different from the testimony the witness gave during this trial.

To decide whether you believe a witness, you may consider the fact that the witness has been convicted of a felony or a crime involving dishonesty or a false statement.

But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

6

When scientific, technical or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.

But that doesn't mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

You must consider some witnesses' testimony with more caution than others.

In this case, the Government has made plea agreements with a co-defendant and cooperating witnesses in exchange for their testimony. Such "plea bargaining," as it's called, provides for the possibility of a lesser sentence than the Codefendant would normally face. Plea bargaining is lawful and proper, and the rules of this court expressly provide for it.

But a witness who hopes to gain more favorable treatment may have a reason to make a false statement in order to strike a good bargain with the Government.

So while a witness of that kind may be entirely truthful when testifying, you should consider that testimony with more caution than the testimony of other witnesses.

And the fact that a witness has pleaded guilty to an offense isn't evidence of the guilt of any other person.

8

The Government has offered evidence that Defendant Joel Esquenazi made a statement or admission while being interviewed by a government agent.  You must consider that evidence with caution and great care.

You must decide for yourself (1) whether the Defendant made the statement, and (2) if so, how much weight to give to it. To make these decisions, you must consider all the evidence about the statement – including the circumstances under which it was made.

You've been permitted to take notes during the trial. Most of you – perhaps all of you – have taken advantage of that opportunity.

You must use your notes only as a memory aid during deliberations. You must not give your notes priority over your independent recollection of the evidence. And you must not allow yourself to be unduly influenced by the notes of other jurors.

I emphasize that notes are not entitled to any greater weight than your memories or impressions about the testimony.

no page 10     11



The indictment charges 21 separate crimes, called "counts." Each count has a number. You'll be given a copy of the indictment to refer to during your deliberations.

Count 1 charges that Defendants Esquenazi, Rodriguez, and others knowingly and willfully conspired to violate the Foreign Corrupt Practices Act ("FCPA") and to commit wire fraud. Count 9 charges that all of the Defendants knowingly and willfully conspired to launder money.

Counts 2-8 charge that Defendants Esquenazi, Rodriguez, and others committed what are called "substantive offenses," specifically violations of the FCPA. Counts 10-21 charge that all of the Defendants committed additional substantive offenses, specifically money laundering. I will explain the law governing those substantive offenses in a moment.

But first note that the Defendants are not charged in Counts 1 and 9 with committing a substantive offense – they are charged with conspiring to commit that offense.

I will also give you specific instructions on conspiracy.

12

Count 1 of the Indictment charges a violation of Title 18, United States Code, Section 371. That section makes it a separate Federal crime for anyone to conspire or agree with someone else to do something that would be another Federal crime if it was actually carried out.

A "conspiracy" is an agreement by two or more people to commit an unlawful act. In other words, it is a kind of "partnership" for criminal purposes. Every member of a conspiracy becomes the agent or partner of every other member.

The Government does not have to prove that all the people named in the indictment were members of the plan, or that those who were members made any kind of formal agreement.

The Government does not have to prove that the members planned together all the details of the plan or the "overt acts" that the indictment charges would be carried out in an effort to commit the intended crime.

The heart of a conspiracy is the making of the unlawful plan itself followed by the commission of any overt act. The Government does not have to prove that the conspirators succeeded in carrying out the plan.

The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1) two or more persons in some way agreed

13

to try to accomplish a shared and unlawful plan;

(2) the Defendant knew the unlawful purpose of the plan and willfully joined in it;

(3) during the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; and

(4) the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

An "overt act" is any transaction or event, even one that may be entirely innocent when viewed alone, that a conspirator commits to accomplish some object of the conspiracy. In order to find a defendant guilty of this crime, you must unanimously decide that at least one member of the conspiracy committed at least one overt act after July 31, 2003.

A person may be a conspirator without knowing all the details of the unlawful plan or the names and identities of all the other alleged conspirators.

If the Defendant played only a minor part in the plan but had a general understanding of the unlawful purpose of the plan and willfully joined in the plan on at least one occasion, that's sufficient for you to find the Defendant guilty.

But simply being present at the scene of an event or merely associating with certain people and discussing common goals and interests doesn't establish proof

14

15

of a conspiracy. A person who doesn't know about a conspiracy but happens to act in a way that advances some purpose of one doesn't automatically become a conspirator.

In this case, regarding the alleged conspiracy, the Indictment charges that Defendants Esquenazi, Rodriguez, and others conspired to violate the Foreign Corrupt Practices Act ("FCPA") and to commit wire fraud. In other words, Defendants Esquenazi, Rodriguez, and others are charged with conspiring to commit two separate substantive crimes.

The Government does not have to prove that the Defendants charged in Count 1 willfully conspired to commit both crimes. It is sufficient if the Government proves beyond a reasonable doubt that the Defendants willfully conspired to commit one of those crimes. But to return a verdict of guilty, you must all agree on which of the two crimes a Defendant conspired to commit.

I will now summarize for you the objects of the alleged conspiracy – violating the Foreign Corrupt Practices Act ("FCPA") and wire fraud.

The **FCPA**, Title 15, United States Code, Section 78dd-2(a)(1), makes it a federal crime or offense to offer to pay, pay, promise to pay, or authorize the payment of money or anything of value to a foreign official for purposes of influencing any act or decision of such foreign official in his or her official capacity or securing any improper advantage in order to obtain or retain business. I will describe this offense in more detail in moment.

**Wire Fraud**, Title 18, United States Code, Section 1343, makes it a federal crime or offense for anyone to use interstate wire communications in carrying out

16

a scheme to defraud. A person commits wire fraud when that person, knowingly and willfully with intent to defraud, devises or participates in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises about a material fact, and when the person transmits or causes to be transmitted by wire some communication to help carry out the scheme to defraud.

The term "scheme to defraud" includes any plan or course of action intended to deceive or cheat a person or entity out of money or property by using false or fraudulent pretenses, representations, or promises.

A statement or representation is "false" or "fraudulent" if it is about a material fact that the speaker knows is untrue or makes with reckless indifference to the truth, and makes with the intent to defraud. A statement or representation may be "false" or "fraudulent" when it is a half truth, or effectively conceals a material fact, and is made with the intent to defraud.

A "material fact" is an important fact that a reasonable person would use to decide whether to do or not do something. A fact is "material" if it has the capacity or natural tendency to influence a person's decision. It doesn't matter whether the decision-maker actually relied on the statement or knew or should have known that the statement was false.

The "intent to defraud" is the specific intent to deceive or cheat someone, usually for personal financial gain or to cause financial loss to someone else.

17

"Good faith" is a complete defense to a charge that requires intent to defraud. A defendant isn't required to prove good faith. The Government must prove intent to defraud beyond a reasonable doubt. An honestly held opinion or an honestly formed belief cannot be fraudulent intent – even if the opinion or belief is mistaken. Similarly, evidence of a mistake in judgment, an error in management, or carelessness can't establish fraudulent intent. But an honest belief that a business venture would ultimately succeed doesn't constitute good faith if the Defendant intended to deceive others by making representations the Defendant knew to be false or fraudulent.

Good-faith is a complete defense to wire fraud because the Government must prove beyond a reasonable doubt that the Defendant acted with intent to defraud. Evidence that the Defendant in good-faith followed the advice of counsel would be inconsistent with such an unlawful intent. Unlawful intent has not been proved if the Defendant, before acting:

- made a full and complete good-faith report of all material facts to an attorney he or she considered competent;

- received the attorney's advice as to the specific course of conduct that was followed; and

- reasonably relied upon that advice in good-faith.

18

To "use" interstate wire communications is to act so that something would normally be sent through wire, radio, or television communications in the normal course of business.

Proof of several separate conspiracies isn't proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies proved is the single overall conspiracy.

You must decide whether the single overall conspiracy charged existed between two or more conspirators. If not, then you find the Defendants not guilty of that charge.

But if you decide that a single overall conspiracy did exist, then you must decide who the conspirators were. And if you decide that a particular Defendant was a member of some other conspiracy – not the one charged – then you must find that Defendant not guilty.

So to find a Defendant guilty, you must all agree that the Defendant was a member of the conspiracy charged – not a member of some other separate conspiracy.

20

Counts 2 through 8 charge a violation of Title 15, United States Code, Section 78dd-2(a)(1). That section makes it a Federal crime to offer to pay, pay, promise to pay, or authorize the payment of money or anything of value to a foreign official for purposes of influencing any act or decision of such foreign official in his or her official capacity or securing any improper advantage in order to obtain or retain business.

Each Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1) The defendant is a "domestic concern," or an officer, director, employee, or agent of a "domestic concern," or a stockholder thereof acting on behalf of such domestic concern, all concepts that I will define for you shortly;

(2) The defendant acted corruptly and willfully;

(3) The defendant made use of the mails or any means or instrumentality of interstate commerce in furtherance of an unlawful act under this statute;

(4) The defendant offered, paid, promised to pay, or authorized the payment of money or of anything of value;

(5) That the payment or gift was to a foreign official or to any person, while the defendant knew that all or a portion of the payment or gift would be offered, given, or promised, directly or indirectly, to a foreign official;

(6) That the payment was for one of four purposes:

21

— to influence any act or decision of the foreign official in his or her official capacity;

— to induce the foreign official to do or omit to do any act in violation of that official's lawful duty;

— to induce that foreign official to use his or her influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality; or

— to secure any improper advantage; and

(7)   That the payment was made to assist the defendant in obtaining or retaining business for or with, or directing business to, any person.

A "domestic concern" is: (a) any individual who is a citizen, national, or resident of the United States; and (b) any corporation, partnership, association, joint-stock company, business trust, unincorporated organization, or sole proprietorship which has its principal place of business in the United States, or which is organized under the laws of a State of the United States or a territory, possession, or commonwealth of the United States.

An act is "corruptly" done if done voluntarily and intentionally, and with a bad purpose or evil motive of accomplishing either an unlawful end or result, or a lawful end or result but by some unlawful method or means. The term "corruptly" in FCPA is intended to connote that the offer, payment, or promise

22

was intended to induce the foreign official to misuse his or her official position.

The term "interstate commerce" means trade, commerce, transportation, or communication among the several States, or between any foreign country and any State or between any State and any place outside thereof, and such term includes the intrastate use of (a) a telephone or other interstate means of communication, or (b) any other interstate instrumentality. If such mechanisms as trade, transportation, or communication are utilized by persons and goods passing between the various states, they are instrumentalities of interstate commerce. I instruct you that, as a matter of law, using a U.S. bank constitutes the use of a means or instrumentality of interstate commerce. So if you find that such a thing occurred, you may find that this element has been proved.

The term "foreign official" means any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality.

An "instrumentality" of a foreign government is a means or agency through which a function of the foreign government is accomplished. State-owned or state-controlled companies that provide services to the public may meet this definition. To decide whether Telecommunications D'Haiti or Teleco is an

23

instrumentality of the government of Haiti, you may consider factors including but not limited to:

(1) whether it provides services to the citizens and inhabitants of Haiti;

(2) whether its key officers and directors are government officials or are appointed by government officials;

(3) the extent of Haiti's ownership of Teleco, including whether the Haitian government owns a majority of Teleco's shares or provides financial support such as subsidies, special tax treatment, loans, or revenue from government-mandated fees;

(4) Teleco's obligations and privileges under Haitian law, including whether Teleco exercises exclusive or controlling power to administer its designated functions; and

(5) whether Teleco is widely perceived and understood to be performing official or governmental functions.

These factors are not exclusive, and no single factor will determine whether Telecommunications D'Haiti or Teleco is an instrumentality of a foreign government. In addition, you do not need to find that all the factors listed above weigh in favor of Teleco being an instrumentality in order to find that Teleco is an instrumentality.

*Promise or Authorization to Pay is Sufficient – Explained*

As I previously told you, one of the elements that the government must prove beyond a reasonable doubt for you to convict a defendant of violating the FCPA is that the defendant offered, paid, promised to pay, or authorized the

24

payment of money or of anything of value. It is not required that the payment actually be made. A promise to pay and the authorization of payment by a domestic concern are each also prohibited by the FCPA. Indeed, a domestic concern, or an officer, employee, or agent of a domestic concern, that engages in bribery of a foreign official indirectly through any other person or entity is liable under the FCPA, just as if the person had engaged in the bribery directly. Thus, if you find that a defendant is a domestic concern, that is, a United States citizen or lawful permanent resident, or that he or she was an officer, employee, or agent of a domestic concern, and that he or she authorized another person to pay a bribe, that authorization alone is sufficient for you to find that this element has been proven.

To repeat, it is not necessary that the payment actually take place. Instead, it is the offer or the authorization that completes the crime. You may find this element satisfied if you find that the defendant promised or authorized an unlawful payment, even if you believe that the payment was not actually made. It is sufficient simply if the defendant believed that a bribe would be paid and that he promised or authorized the bribe to be paid.

*Payments to Third Parties — "Knowing" — Defined*

Provided all the other elements are present, an offer to pay, payment, promise to pay, or authorization of payment is unlawful under the Foreign Corrupt

25

Practices Act if it is made to any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official.

For the purposes of this section, a person's state of mind is "knowing" with respect to conduct, a circumstance, or a result if (a) such person is aware that such person is engaging in such conduct, that such circumstance exists, or that such result is substantially certain to occur; or (b) such person has a firm belief that such circumstance exists or that such result is substantially certain to occur. A person is deemed to have such knowledge if the evidence shows that he or she was aware of a high probability of the existence of such circumstance, unless he or she actually believes that such circumstance does not exist.

*"Obtaining or Retaining Business" – Explained*

The Foreign Corrupt Practices Act prohibits offers, payments, promises to pay, or authorization of payments made by a domestic concern "in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person or company." It is therefore not necessary for the government to prove that the domestic concern itself actually obtained or retained any business whatsoever as a result of an unlawful offer, payment, promise, or gift. Moreover, the Act's prohibition of corrupt payments to assist in obtaining or

26

retaining business is not limited to the obtaining or renewal of contracts or other business, but also includes a prohibition against corrupt payments related to the execution or performance of contracts or the carrying out of existing business, such as a payment to a foreign official for the purpose of obtaining more favorable tax treatment.

*Solicitation of Bribe Not a Defense – Explained*

It does not matter who suggested that a corrupt offer, payment, promise or gift be made. The Act prohibits any payment or gift intended to influence the recipient, regardless of who first suggested it.  It is not a defense that the payment was demanded on the part of a government official as a price for continuing to do business or other benefit or that the business may be harmed if the payment is not made.  That the offer to pay, payment, promise to pay, or authorization of payment may have been first suggested by the recipient is not deemed an excuse for a domestic concern's decision to make a corrupt payment, nor does it alter the corrupt purpose with which the offer to pay, payment, promise to pay, or authorization of payment was made.

27

Count 9 charges a violation of Title 18, United States Code, Section 1956(h). That section makes it a Federal crime to conspire to engage in money laundering or transactions involving the proceeds of specified unlawful activity that violates Title 18, United States Code, Sections 1956 or 1957.

Section 1956(a)(1)(B)(i) prohibits a person from knowingly conducting or attempting to conduct a financial transaction when the person knew that the money or property involved in the transaction was the proceeds of some kind of unlawful activity, when the money or property did come from a specified unlawful activity alleged in the indictment, and the person knew that the transaction was designed in whole or in part, to conceal or disguise the nature, location, source, ownership, or the control of the proceeds.

Section 1957 prohibits a person from knowingly engaging or attempting to engage in a monetary transaction when the person knew that the transaction involved property or funds that were the proceeds of some criminal activity, when the property had a value of more than $10,000, the property was in fact proceeds of a specified unlawful activity alleged in the indictment, and the transaction took place in the United States.

A "conspiracy" is an agreement by two or more persons to commit an unlawful act. In other words, it is a kind of partnership for criminal purposes.

28

Every member of the conspiracy becomes the agent or partner of every other member.

The Government does not have to prove that all the people named in the indictment were members of the plan, or that those who were members made any kind of formal agreement. The heart of a conspiracy is the making of the unlawful plan itself, so the Government does not have to prove that the conspirators succeeded in carrying out the plan.

Each defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1)   two or more people agreed to try to accomplish a common and unlawful plan to violate 18 U.S.C. §§ 1956 or 1957; and

(2)   the Defendant knew about the plan's unlawful purpose and willfully joined in it.

A person may be a conspirator even without knowing all the details of the unlawful plan or the names and identities of all the other alleged conspirators.

If a defendant played only a minor part in the plan but had a general understanding of the unlawful purpose of the plan – and willfully joined in the plan on at least one occasion – that's sufficient for you to find the Defendant guilty.

But simply being present at the scene of an event or merely associating with

29

certain people and discussing common goals and interests doesn't establish proof of a conspiracy. Also a person who doesn't know about a conspiracy but happens to act in a way that advances some purpose of one doesn't automatically become a conspirator.

The phrase "specified unlawful activity" means any one of the following three kinds of illegal activity: (1) violation of the FCPA, (2) wire fraud, or (3) violation of Haitian bribery law.

Like U.S. law, Haitian law also outlaws bribery. Specifically, Haitian law makes it illegal for a public official or any agent or officer of a public authority to accept promises, offers, gifts, or presents in return for performing actions or refraining from performing actions as a function of his or her position or job. Similarly, Haitian law makes it illegal for any person to corrupt or attempt to corrupt any public official or any agent or officer of a public authority, through promises, offers, gifts, or presents in order to obtain a favorable opinion, adjudications, undertakings, or other benefits of any type, or any other action by the department of the official, agent, or officer.

In order to determine whether a violation of Haitian bribery law took place, you must determine whether Telecommunications D'Haiti or Teleco is a public authority of Haiti as that term is defined by Haitian law. You heard testimony

30

regarding Haitian law during the trial.

A "monetary transaction" means the deposit, withdrawal, transfer, exchange of funds or a monetary instrument by, through, or to a financial institution in a way that affects interstate commerce.

Under Section 1957, it does not matter whether the persons named in the indictment knew the precise nature of the crime or that the property came from committing the unlawful activity alleged in the indictment. But the Government must prove that the persons named in the indictment conspired to engage in monetary transactions with property known to be obtained or derived from committing some crime. Also, it doesn't matter whether all the property involved was derived from a crime. The Government only has to prove that the persons named in the indictment conspired to engage in a monetary transaction with more than $10,000 worth of property obtained or derived from committing a crime.

31

Counts 10 through 21 charge a violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).   That section makes it a Federal crime to knowingly engage in certain kinds of financial transactions commonly known as money laundering.

The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1) the Defendant knowingly conducted or tried to conduct financial transactions;

(2) the Defendant knew that the money or property involved in the transaction were the proceeds of some kind of unlawful activity;

(3) money or property did come from an unlawful activity, specifically, a violation of the FCPA, wire fraud, or a violation of Haitian bribery law; and

(4) the Defendant knew that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or the control of the proceeds.

To "conduct" a transaction means to start or finish a transaction, or to participate in a transaction at any point.

A "transaction" means a purchase, sale, loan, promise, gift, transfer, delivery, or other disposition of money or property.

A "financial transaction" means a transaction that in any way or to any

32

degree affects interstate or foreign commerce by sending or moving money by wire or other means or a transaction involving the use of a financial institution that is involved in interstate or foreign commerce, or whose activities affect interstate or foreign commerce in any way or degree. The phrase "financial institution" includes an FDIC insured bank, a commercial bank or trust company, or any credit union.

"Interstate or foreign commerce" means trade and other business activity between people or businesses in at least two states or between people or businesses in the United States and people or businesses outside the United States.

To know "that the money or property involved in the transaction came from some kind of unlawful activity" is to know that the money or property came from an activity that's a felony under state, Federal, or foreign law.

The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of the activity.

The phrase "specified unlawful activity" means any one of the following three kinds of illegal activity: (1) violation of the FCPA, (2) wire fraud, or (3) violation of Haitian bribery law.

33

During a conspiracy, if a conspirator commits a crime to advance the conspiracy toward its goals, then in some cases a coconspirator may be guilty of the crime even though the coconspirator did not participate directly in the crime.

So regarding Counts 2-8, and Defendants Joel Esquenazi and Carlos Rodriguez, if you have first found either of those Defendants guilty of the crime of conspiracy as charged in Count 1, you may also find that Defendant guilty of any of the crimes charged in Counts 2-8 even though the Defendant did not personally participate in the crime.

And regarding Counts 10-21 and Defendants Joel Esquenazi and Carlos Rodriguez, if you have first found either of those Defendants guilty of the crime of money laundering conspiracy as charged in Count 9, which I will explain in a moment, you may also find that Defendant guilty of any of the crimes charged in Counts 10-21 even though the Defendant did not personally participate in the crime.

To do so, you must find beyond a reasonable doubt:

(1)     During the conspiracy a conspirator committed the additional crime charged to further the conspiracy's purpose;

(2)     The Defendant was a knowing and willful member of the conspiracy when the crime was committed; and

(3)     It was reasonably foreseeable that a coconspirator would commit the crime as a consequence of the conspiracy.

34

In Counts 2-8 and 10-21, the Defendants are charged with aiding and abetting the commission of the crimes charged.  It's possible to prove the Defendant guilty of a crime even without evidence that the Defendant personally performed every act charged.

Ordinarily, any act a person can do may be done by directing another person, or "agent."  Or it may be done by acting with or under the direction of others.

A Defendant "aids and abets" a person if the Defendant intentionally joins with the person to commit a crime.

A Defendant is criminally responsible for the acts of another person if the Defendant aids and abets the other person.  A Defendant is also responsible if the Defendant willfully directs or authorizes the acts of an agent, employee, or other associate.

But finding that a Defendant is criminally responsible for the acts of another person requires proof that the Defendant intentionally associated with or participated in the crime – not just proof that the Defendant was simply present at the scene of a crime or knew about it.

In other words, you must find beyond a reasonable doubt that the Defendant was a willful participant and not merely a knowing spectator.

35

If a Defendant's knowledge of a fact is an essential part of a crime, it's enough that the Defendant was aware of a high probability that the fact existed – unless the Defendant actually believed the fact didn't exist.

"Deliberate avoidance of positive knowledge" – which is the equivalent of knowledge – occurs, for example, if a defendant engages in a financial transaction and believes the money or property involved in the transaction were the proceeds of an unlawful activity but deliberately avoids learning that the money or property did come from an unlawful activity so he can deny knowledge later.

So you may find that a defendant knew about the unlawful activity if you determine beyond a reasonable doubt that the defendant (1) actually knew about the unlawful activity, or (2) had every reason to know but deliberately closed his eyes.

But I must emphasize that negligence, carelessness, or foolishness isn't enough to prove that a Defendant knew about the unlawful activity.

36

Evidence of a defendant's character traits may create a reasonable doubt.

You should consider testimony that a defendant is an honest and law-abiding citizen along with all the other evidence to decide whether the Government has proved beyond a reasonable doubt that the Defendant committed the offense.

You'll see that the indictment charges that a crime was committed "on or about" a certain date. The Government doesn't have to prove that the crime occurred on an exact date. The Government only has to prove beyond a reasonable doubt that the crime was committed on a date reasonably close to the date alleged.

The word "knowingly" means that an act was done voluntarily and intentionally and not because of a mistake or by accident.

The word "willfully" means that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law. While a person must have acted with the intent to do something the law forbids before you can find that the person acted "willfully," the person need not be aware of the specific law or rule that his conduct may be violating.

38

Each count of the indictment charges a separate crime against one or more of the Defendants. You must consider each crime and the evidence relating to it separately. And you must consider the case of each Defendant separately and individually. If you find a Defendant guilty of one crime, that must not affect your verdict for any other crime or any other Defendant.

I caution you that each Defendant is on trial only for the specific crimes charged in the indictment. You're here to determine from the evidence in this case whether each Defendant is guilty or not guilty of those specific crimes.

You must never consider punishment in any way to decide whether a Defendant is guilty. If you find a Defendant guilty, the punishment is for the Judge alone to decide later.

Your verdict, whether guilty or not guilty, must be unanimous – in other words, you must all agree. Your deliberations are secret, and you'll never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement. While you're discussing the case, don't hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But don't give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you're judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case.

When you get to the jury room, choose one of your members to act as foreperson.  The foreperson will direct your deliberations and will speak for you in court.

A verdict form has been prepared for your convenience.

[Explain verdict]

Take the verdict form with you to the jury room.  When you've all agreed on the verdict, your foreperson must fill in the form, sign it,  date it, and carry it.  Then you'll return it to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the marshal.  The marshal will bring it to me and I'll respond as promptly as possible – either in writing or by talking to you in the courtroom.  But I caution you not to tell me how many jurors have voted one way or the other at that time.

41

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. <u>09-21010-cr-JEM</u>
18 U.S.C. § 371
15 U.S.C. § 78dd-2
18 U.S.C. § 2
18 U.S.C. § 1956(h)
18 U.S.C. § 1956(a)(1)(B)(i)
18 U.S.C. § 981(a)(1)(c)
18 U.S.C. § 982(a)(1)

UNITED STATES OF AMERICA

vs.

JOEL ESQUENAZI,
and
CARLOS RODRIGUEZ,

Defendants.
_____/

## INDICTMENT

The Grand Jury charges that:

At all times relevant to this Indictment, unless otherwise specified:

## GENERAL ALLEGATIONS

*Legal Background*

1.      The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, *et seq.* ("FCPA"), prohibited certain classes of persons and entities from corruptly making payments to foreign government officials to assist in obtaining or retaining business.  Specifically, the FCPA prohibited certain corporations and individuals from willfully making use of any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of money or anything of value to any person, while knowing that

all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to a foreign official to influence the foreign official in his or her official capacity, induce the foreign official to do or omit to do an act in violation of his or her lawful duty, or to secure any improper advantage in order to assist in obtaining or retaining business for or with, or directing business to, any person.

2.     The Republic of Haiti's Penal Code Article 140 prohibited persons from corrupting or attempting to corrupt by promises, offers, gifts, or presents, an official, agent, or officer holding a position in any administrative, judicial, or military public authority, in order to obtain a favorable opinion; records, statements, certificates or assessments contrary to the truth; or positions, employment, adjudications, undertakings or other benefits of any type; or any other action by the department of the official, agent or officer. The Republic of Haiti's Penal Code Article 137 prohibited any administrative, judicial, or military public official or any agent or officer of a public authority from accepting offers or promises or receiving gifts of promises to perform an action as a function of his position or his job, even one that is innocent but not subject to the payment of salary.

*Entities and Individuals*

3.     Telecommunications D'Haiti ("Haiti Teleco") was the Republic of Haiti's state-owned national telecommunications company. Haiti Teleco was the only provider of non-cellular telephone service to and from Haiti. Various international telecommunications companies contracted with Haiti Teleco to allow those companies' customers to make calls to Haiti. These telecommunications companies would pay Haiti Teleco a set rate for each minute of telephone calls to Haiti.

2

4. From in or around May 2001, to in or around April 2003, defendant **ROBERT ANTOINE** was the Director of International Relations of Haiti Teleco. In this position, it was **ANTOINE's** responsibility to negotiate contracts with international telecommunications companies on behalf of Haiti Teleco. **ANTOINE** was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

5. Corporation X was a privately owned telecommunications company that was incorporated in Nevada on or about July 1, 1996, incorporated in Florida on or about February 2, 2002, and was headquartered in Miami, Florida. Corporation X executed a series of contracts with Haiti Teleco that allowed Corporation X's customers to place calls to Haiti. Corporation X was a "domestic concern" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

6. Defendant **JOEL ESQUENAZI** was the President and Director of Corporation X. In this position, he negotiated and signed contracts with Haiti Teleco on behalf of Corporation X. **ESQUENAZI** had signatory authority over Corporation X's bank accounts and had an approximately 75% ownership interest in Corporation X. **ESQUENAZI** was a citizen of the United States. **ESQUENAZI** was a "domestic concern" and an officer, employee, and agent of a domestic concern, as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

7. Defendant **CARLOS RODRIGUEZ** was the Executive Vice President of Corporation X. In this position, **RODRIGUEZ** was in charge of overseeing Corporation X's finances. **RODRIGUEZ** had signatory authority over Corporation X's bank accounts and had an approximately 20% ownership interest in Corporation X. **RODRIGUEZ** was a resident of the United States. **RODRIGUEZ** was a "domestic concern" and an officer, employee, and agent of a domestic concern, as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

3

8.    The General Counsel ("General Counsel") was the Vice President and General Counsel for Corporation X. In this position, the General Counsel drafted, negotiated and reviewed contracts, among other things. He had an approximately 5% ownership interest in Corporation X. The General Counsel was a citizen of the United States. The General Counsel was a "domestic concern" and an officer, employee, and agent of a domestic concern, as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

9.    From in or around March 1998, through in or around January 2002, Antonio Perez was Corporation X's Controller. As Controller, Perez managed the accounting department, prepared financial statements, and sought approval for and paid bills. Perez was a citizen of the United States. Perez was a "domestic concern" and an employee and agent of a domestic concern, as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

10.    Juan Diaz served as an intermediary between Corporation X and **ROBERT ANTOINE** from in or around November 2001, until in or around at least October 2003. In or around November 2001, Diaz opened a business checking account at Kislak National Bank in Florida in the name of JD Locator Services, Inc., ("JD Locator"). On or about August 19, 2002, Diaz incorporated JD Locator in Florida listing its principal address as located in Miami, Florida. Diaz was a citizen of the United States. Diaz was a "domestic concern" and an agent of a domestic concern as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

11.    Co-conspirator A served as an intermediary between Corporation X and **ROBERT ANTOINE** from in or around January 2002, through in or around at least May 2002. Co-conspirator A was the owner of Intermediary Company 1. Intermediary Company 1 was incorporated in Florida, listed its principal address as Miami, Florida, and had a bank account at

4

Ocean Bank in Miami, Florida. Co-conspirator A is a citizen of Haiti. Co-conspirator A is an officer, employee, and agent of a domestic concern as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

12. Co-conspirator B served as an intermediary between Corporation X, JD Locator and **ROBERT ANTOINE** from in or around November 2001, until in or around August 2002. Co-conspirator B was the Director of Intermediary Company 2. Intermediary Company 2 was incorporated in Florida, listed its principal address as Miami, Florida, and had a bank account at First Union Bank in Miami, Florida. Co-conspirator B was a citizen of the United States. Co-conspirator B was a "domestic concern" and an officer, employee, and agent of a domestic concern as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

13. From in or around June 2003, to in or around April 2004, defendant **JEAN RENE DUPERVAL** was the Director of International Relations of Haiti Teleco. Similar to his predecessor **ROBERT ANTOINE**, it was **DUPERVAL's** responsibility to negotiate contracts with international telecommunications companies on behalf of Haiti Teleco. **DUPERVAL** was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

14. Defendant **MARGUERITE GRANDISON** was **JEAN RENE DUPERVAL's** sister and served as an intermediary between Corporation X and **DUPERVAL**. **GRANDISON** was the President of Telecom Consulting Services Corp., ("Telecom Consulting"), a Florida corporation with its principal place of business in Miramar, Florida. On or about November 18, 2003, **GRANDISON** opened a business checking account in the name of Telecom Consulting with SouthTrust Bank in Miami, Florida. **GRANDISON** was a lawful permanent resident of the United States. **GRANDISON** was a "domestic concern" and an and an officer, employee, and agent of a

domestic concern as these terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

## COUNT 1
### Conspiracy
### (18 U.S.C. § 371)

1.  Paragraphs 1 though 14 of the General Allegations are re-alleged and incorporated by reference as though set forth herein.

2.  From in or around November 2001, through in or around March 2005, the exact dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**JOEL ESQUENAZI,**
**CARLOS RODRIGUEZ,**
**and**
**MARGUERITE GRANDISON,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly conspire, confederate and agree with each other, and with other persons, known and unknown to the Grand Jury, including Antonio Perez, Juan Diaz, the General Counsel, Co-conspirators A and B, Corporation X, and Intermediary Companies 1 and 2, to commit offenses against the United States, that is:

(a) to knowingly make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official, or any person, while knowing that all or a part of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such

6

official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist **JOEL ESQUENAZI, CARLOS RODRIGUEZ, MARGUERITE GRANDISON**, Antonio Perez, the General Counsel, and Corporation X, and others known and unknown to the Grand Jury, in obtaining and retaining business for and with, and directing business to Corporation X, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2(a);

(b) to knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain signs, signals and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## PURPOSES OF THE CONSPIRACY

3.     A purpose of the conspiracy was for the defendants to unjustly enrich themselves by having **JOEL ESQUENAZI, CARLOS RODRIGUEZ, MARGUERITE GRANDISON**, along with Antonio Perez, Juan Diaz, the General Counsel, Corporation X, and other Co-conspirators, known and unknown to the Grand Jury, provide bribe payments to Robert Antoine and Jean Rene Duperval of Haiti Teleco, in exchange for business advantages to be bestowed upon Corporation X by Haiti Teleco. These business advantages to Corporation X included, but were not limited to, preferred telecommunications rates, reduced number of minutes for which payment was owed, which effectively reduced the per minute rate, and a variety of credits toward sums owed. It was

7

a further purpose of the conspiracy to defraud Haiti Teleco of revenue by obtaining these advantages for Corporation X.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which **JOEL ESQUENAZI, CARLOS RODRIGUEZ, MARGUERITE GRANDISON,** and their co-conspirators sought to accomplish the objects and purposes of the conspiracy included, among other things, the following:

4.      **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** would authorize the payments of bribes on behalf of Corporation X to the Director of International Relations of Haiti Teleco, an office held by Robert Antoine and subsequently held by Jean Rene Duperval.

5.      Corporation X would make bribe payments to Robert Antoine and Jean Rene Duperval and, in exchange, would receive various business advantages, including the reduction of Corporation X's debt to Haiti Teleco, and the continuance of Corporation X's connection to Haiti Teleco's telecommunication lines.  **JOEL ESQUENAZI** would also give a Rolex watch to Duperval.

6.      To disguise the true nature of the bribe payments, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** would cause payments to be made for fictional "consulting services" to intermediary companies chosen by Robert Antoine and Jean Rene Duperval.  To aid in the concealment of the bribe payments, **ESQUENAZI** and **RODRIGUEZ** would cause Corporation X to falsely record these payments as "commissions" or "consulting fees" on financial, banking, and accounting documents.

7.      One of the intermediary companies used to conceal and disguise the bribe payments was JD Locator, a shell entity used for the purpose of forwarding illicit payments to Robert Antoine.

8

**JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** would send funds and checks from Company X's bank accounts to Juan Diaz, for deposit in the JD Locator bank account at Kislak National Bank ("JD Locator bank account"). The money was intended for Antoine. Over the course of the conspiracy, **ESQUENAZI** and **RODRIGUEZ** would cause over $600,000 to be transferred by wire transfer and check to the JD Locator bank account from Corporation X for purported "consulting services" when, in fact, such services were never rendered or intended to be rendered.

8.     Juan Diaz, at Robert Antoine's direction, would disburse the funds from the JD Locator bank account by various means including: (1) sending wire transfers to Antoine's Washington Mutual bank account; (2) issuing checks made payable to Antoine, which were then deposited into Antoine's Washington Mutual bank account; (3) withdrawing currency to be given to Antoine, some of which currency was then deposited into Antoine's Washington Mutual bank account; and (4) sending funds to family members of Antoine and others at Antoine's direction.

9.     Intermediary Company 1 was another company, like JD Locator, used to conceal the bribe payments from Corporation X. **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** would authorize wire transfers to Intermediary Company 1's bank account at Ocean Bank from Corporation X's bank accounts. These wires were intended for Robert Antoine. Over the course of the conspiracy, **ESQUENAZI** and **RODRIGUEZ** would cause approximately $130,000 to be transferred to Intermediary Company 1's bank account from Corporation X for purported "consulting services," when, in fact, such services were never rendered or intended to be rendered. Upon receipt of such funds, Co-conspirator A, at Antoine's direction, would wire the funds to Antoine's Washington Mutual bank account or issue checks to Antoine, which were then deposited in Antoine's Washington Mutual bank account.

9

10.    In another effort to direct bribe payments to Robert Antoine, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** would send prepaid calling cards, valued at approximately $14,625, to Co-conspirator B, who would then sell the cards at his store and give Antoine the cash from the sales.

11.    After Jean Rene Duperval assumed the role of Director of International Relations, which had previously been held by Robert Antoine, **JOEL ESQUENAZI** and the General Counsel would assist in the incorporation of Telecom Consulting as a shell company for the benefit of Duperval. Telecom Consulting was an intermediary company used to conceal bribe payments from **ESQUENAZI** and **CARLOS RODRIGUEZ** to Duperval. **MARGUERITE GRANDISON** would be listed as Telecom Consulting's President and was its sole officer. The General Counsel would be listed as the registered agent of Telecom Consulting.

12.    With the aid of **JOEL ESQUENAZI, MARGUERITE GRANDISON** would establish a bank account in the name of Telecom Consulting and list herself as the sole signatory on that account. **ESQUENAZI** and **CARLOS RODRIGUEZ** would direct that bribe payments for Jean Rene Duperval be paid to Telecom Consulting. Over the course of the conspiracy, the bank account of Telecom Consulting would receive over $70,000 from Corporation X in bribes via wire transfers and an intrabank transfer from Corporation X. Telecom Consulting would not perform any consulting services of any kind for Corporation X or any other telecommunications company.

13.    **MARGUERITE GRANDISON**, at Jean Rene Duperval's direction, would disburse the funds received from Corporation X and deposited into Telecom Consulting's bank account by: (1) issuing checks from Telecom Consulting's account made payable to Duperval, which were then deposited into Duperval's bank accounts; (2) issuing checks from Telecom Consulting's account

10

made payable to Duperval, which were then caused to be cashed by Duperval; (3) issuing checks from Telecom Consulting's account made payable to Duperval's family, which were then deposited into Duperval's bank accounts; (4) withdrawing currency from Telecom Consulting's account on behalf of Duperval; and (5) making purchases with funds from Telecom Consulting's account for the benefit on Duperval.

## OVERT ACTS

In furtherance of the conspiracy and to achieve the objects and purposes thereof, at least one of the conspirators committed, or caused to be committed, in the Southern District of Florida, and elsewhere, the following overt acts, among others:

On or about the following dates, **JOEL ESQUENAZI, CARLOS RODRIGUEZ** and Antonio Perez caused checks to be issued from Corporation X's Bank of America bank account, made payable to JD Locator, which were subsequently deposited by Juan Diaz into the JD Locator bank account, in the following amounts:

| Overt Act | Approximate Date Check Issued | Signed by | Approximate Amount |
|---|---|---|---|
| 1 | November 2, 2001 | **CARLOS RODRIGUEZ** | $6,375 |
| 2 | November 30, 2001 | **JOEL ESQUENAZI** | $30,000 |

On or about the following dates, **CARLOS RODRIGUEZ** caused checks to be issued from Corporation X's Bank of America bank account, made payable to JD Locator, which were subsequently deposited by Juan Diaz into the JD Locator bank account, in the following amounts:

| Overt Act | Approximate Date Check Issued | Signed by | Approximate Amount |
|---|---|---|---|
| 3 | January 18, 2002 | **CARLOS RODRIGUEZ** | $20,000 |

11

| 4 | January 24, 2002 | **CARLOS RODRIGUEZ** | $20,000 |
|---|---|---|---|

A cashier's check was issued from Corporation X's bank account at International Finance Bank, made payable to JD Locator, which was subsequently deposited by Juan Diaz into the JD Locator bank account:

| Overt Act | Approximate Date Check Issued | Authorized by | Approximate Amount |
|---|---|---|---|
| 5 | February 8, 2002 | **CARLOS RODRIGUEZ** | $40,000 |

On or about the following dates, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused checks to be issued from Corporation X's bank account at International Finance Bank, made payable to JD Locator, which were subsequently deposited by Juan Diaz into the JD Locator bank account, in the following amounts:

| Overt Act | Approximate Date Check Issued | Signed by | Approximate Amount |
|---|---|---|---|
| 6 | April 12, 2002 | **CARLOS RODRIGUEZ** | $33,818 |
| 7 | May 10, 2002 | **CARLOS RODRIGUEZ** | $25,000 |
| 8 | July 15, 2002 | **CARLOS RODRIGUEZ** | $3,000 |
| 9 | July 17, 2002 | **JOEL ESQUENAZI** | $40,000 |
| 10 | July 24, 2002 | **CARLOS RODRIGUEZ** | $50,000 |
| 11 | August 1, 2002 | **CARLOS RODRIGUEZ** | $40,000 |
| 12 | August 12, 2002 | **CARLOS RODRIGUEZ** | $3,000 |
| 13 | August 14, 2002 | **CARLOS RODRIGUEZ** | $50,000 |

On or about the following dates, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused checks to be issued from Corporation X's bank account at SouthTrust Bank, made payable to JD Locator, which were subsequently deposited by Juan Diaz into the JD Locator bank account, in the

12

following amounts:

| Overt Act | Approximate Date Check Issued | Signed by | Approximate Amount |
|---|---|---|---|
| 14 | November 7, 2002 | CARLOS RODRIGUEZ | $45,000 |
| 15 | November 22, 2002 | JOEL ESQUENAZI | $45,000 |
| 16 | January 22, 2003 | CARLOS RODRIGUEZ | $50,000 |
| 17 | January 30, 2003 | JOEL ESQUENAZI | $50,000 |
| 18 | February 24, 2003 | CARLOS RODRIGUEZ | $25,000 |
| 19 | March 14, 2003 | CARLOS RODRIGUEZ | $25,000 |
| 20 | March 24, 2003 | CARLOS RODRIGUEZ | $25,000 |
| 21 | March 28, 2003 | CARLOS RODRIGUEZ | $25,000 |
| 22 | June 10, 2003 | JOEL ESQUENAZI | $3,000 |

23.   On or about February 4, 2002, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused a wire transfer of $20,000 to be sent from Corporation X's bank account at International Finance Bank to JD Locator's bank account.

On or about the following dates, Juan Diaz caused checks to be issued from JD Locator's bank account, payable to Robert Antoine, which were subsequently deposited into Antoine's Washington Mutual Bank account, in the following amounts:

| Overt Act | Approximate Date Check Issued | Approximate Amount | Memo |
|---|---|---|---|
| 24 | August 19, 2002 | $69,750 | Inv# 57645 |
| 25 | November 20, 2002 | $4,900 | Inv 21571 |
| 26 | November 25, 2002 | $4,950 | Inv 21575 |

13

| 27 | December 5, 2002 | $4,800 | Inv# 21603 |
| 28 | December 10, 2002 | $4,800 | Inv 21614 |
| 29 | December 21, 2002 | $2,465 | Inv 21654 |
| 30 | February 3, 2003 | $4,900 | Inv 037351 |
| 31 | February 7, 2003 | $2,380 | Inv 037382 |
| 32 | February 11, 2003 | $4,900 | Inv 037402 |
| 33 | February 18, 2003 | $4,900 | Inv 037453 |
| 34 | February 21, 2003 | $3,700 | Inv 037492 |
| 35 | March 25, 2003 | $4,500 | Inv 037536 |
| 36 | March 27, 2003 | $4,500 | Inv 037579 |
| 37 | April 7, 2003 | $4,500 | Inv 037612 |
| 38 | April 14, 2003 | $4,500 | Inv 037647 |
| 39 | April 25, 2003 | $4,500 | Inv 037725 |

On or about the following dates, Juan Diaz caused wire transfers to be made from JD Locator's bank account to Robert Antoine's Washington Mutual Bank account, in the following amounts:

| Overt Act | Approximate Date of Wire Transfer | Approximate Amount |
| --- | --- | --- |
| 40 | May 31, 2002 | $58,223 |
| 41 | July 22, 2002 | $33,000 |
| 42 | July 30, 2002 | $46,500 |
| Overt Act | Approximate Date of Wire Transfer | Approximate Amount |
| 43 | August 9, 2002 | $37,200 |

44.   On or about August 15, 2003, Juan Diaz cashed a check made payable to himself from

the JD Locator bank account for $9,000, which currency he subsequently tendered to Robert Antoine.

45.   On or about August 19, 2003, Juan Diaz cashed a check made payable to himself from the JD Locator bank account for $5,000, which currency he subsequently tendered to Robert Antoine.

On or about the following dates, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused the following wire transfers to be made to Intermediary Company 1's Ocean Bank account from Corporation X's bank account at Bank of America:

| Overt Act | Approximate Date of Wire Transfer | Approximate Amount | Originator to Beneficiary Information |
|---|---|---|---|
| 46 | January 8, 2002 | $15,000 | "Consulting Fees" |
| 47 | January 24, 2002 | $18,000 | "Consulting Fees" |

On or about the following dates, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused the following wire transfers to be made to Intermediary Company 1's Ocean Bank account from Corporation X's bank account at International Finance Bank:

| Overt Act | Approximate Date of Wire Transfer | Approximate Amount | Originator to Beneficiary Information |
|---|---|---|---|
| 48 | March 5, 2002 | $37,000 | "Consulting Fees" |
| 49 | April 17, 2002 | $35,000 | "Consult. Fees" |
| Overt Act | Approximate Date of Wire Transfer | Approximate Amount | Originator to Beneficiary Information |
| 50 | April 29, 2002 | $25,000 | "Consulting Fees" |

On or about the following dates, Co-conspirator A caused wire transfers to be made from Intermediary Company 1's Ocean Bank account to the Washington Mutual Bank account of Robert

15

Antoine, in the following amounts:

| Overt Act | Approximate Date of Wire Transfer | Approximate Amount |
|---|---|---|
| 51 | March 8, 2002 | $14,000 |
| 52 | March 11, 2002 | $15,000 |
| 53 | April 19, 2002 | $15,000 |
| 54 | May 1, 2002 | $5,000 |

On or about the following dates, Co-conspirator A caused checks to be issued from Intermediary Company 1's bank account, payable to Robert Antoine, which were subsequently deposited into Antoine's Washington Mutual Account, in the following amounts:

| Overt Act | Approximate Date Check Issued | Approximate Amount |
|---|---|---|
| 55 | May 3, 2002 | $4,600 |
| 56 | May 24, 2002 | $16,000 |

57.     On or about October 16, 2003, the General Counsel incorporated Telecom Consulting in the State of Florida, listing himself as the registered agent for Telecom Consulting.

58.     On or about October 17, 2003, **JOEL ESQUENAZI** informed Jean Rene Duperval via interstate electronic mail communication that Telecom Consulting had been created and that a bank account could now be opened.

59.     On or about October 19, 2003, **MARGUERITE GRANDISON** received information via interstate electronic mail communication from Jean Rene Duperval that Telecom Consulting had been created and that a bank account could now be opened.

60.     On or about October 24, 2003, **JOEL ESQUENAZI** sent information about **MARGUERITE GRANDISON** and Telecom Consulting to a SouthTrust Bank employee via

16

interstate electronic mail communication as part of the process of opening a bank account.

61.    On or about November 18, 2003, **MARGUERITE GRANDISON** signed a Telecom Consulting resolution to open a bank deposit account at SouthTrust Bank.

62.    On or about November 18, 2003, **MARGUERITE GRANDISON** opened a checking account at SouthTrust Bank for Telecom Consulting.

63.    On or about November 18, 2003, Telecom Consulting and Corporation X executed a Commission Agreement, between **JOEL ESQUENAZI** and **MARGUERITE GRANDISON**, which listed Telecom Consulting as a consultant who would assist Corporation X in obtaining a contract or contracts with Haiti Teleco.

64.    On or about November 20, 2003, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused an intrabank transfer in the amount of $15,000 to be sent from Corporation X's SouthTrust bank account to Telecom Consulting's SouthTrust bank account.

On or about the following dates, **JOEL ESQUENAZI** and **CARLOS RODRIGUEZ** caused the following wire transfers to be sent from Corporation X's SouthTrust bank account to Telecom Consulting's SouthTrust bank account:

| Overt Act | Approximate Date of Wire Transfer | Approximate Amount | Originator to Beneficiary Information |
|---|---|---|---|
| 65 | December 16, 2003 | $15,000 | "Consulting Fees" |
| 66 | December 30, 2003 | $10,000 | "Consulting Fees" |
| 67 | January 23, 2004 | $10,000 | "Consultant Fees" |
| 68 | February 3, 2004 | $10,000 | "Consulting Fees" |
| 69 | February 19, 2004 | $5,000 | "Consulting Fees" |
| 70 | March 25, 2004 | $10,000 | "Consulting Fees" |

On or about the following dates, **MARGUERITE GRANDISON** caused checks to be issued from Telecom Consulting's SouthTrust bank account, which were payable to Jean Rene Duperval and subsequently deposited into Duperval's Miami Federal Credit Union account, in the following amounts:

| Overt Act | Approximate Date Check Issued | Approximate Amount | Memo |
|---|---|---|---|
| 71 | March 1, 2004 | $8,000 | none |
| 72 | April 30, 2004 | $8,235 | none |
| 73 | July 12, 2004 | $2,596 | none |
| 74 | July 28, 2004 | $2,596 | "payroll 7/04" |
| 75 | August 27, 2004 | $2,596 | "payroll 8/04" |
| 76 | September 20, 2004 | $2,596 | "payroll-9/04" |
| 77 | December 23, 2004 | $3,000 | "Bonus 2004" |

On or about the following dates, **MARGUERITE GRANDISON** caused checks to be issued from Telecom Consulting's SouthTrust bank account, payable to Jean Rene Duperval, which were subsequently deposited into Duperval's Wachovia bank accounts, in the following amounts:

| Overt Act | Approximate Date Check Issued | Approximate Amount | Memo |
|---|---|---|---|
| 78 | July 28, 2004 | $5,473 | "travel expenses, office supplies" |
| 79 | October 20, 2004 | $2,596 | none |

On or about the following dates, **MARGUERITE GRANDISON** caused checks to be issued from Telecom Consulting's SouthTrust bank account, which were made payable to Jean Rene Duperval, and which Duperval subsequently caused to be cashed, in the following amounts:

18

| Overt Act | Approximate Date Check Issued | Amount | Memo |
|-----------|-------------------------------|--------|------|
| 80 | June 24, 2004 | $2,500 | none |
| 81 | December 15, 2004 | $2,500 | none |
| 82 | March 29, 2005 | $3,000 | none |

83.    On or about December 16, 2003, the same day that Telecom Consulting received a $15,000 wire transfer from Corporation X, **JOEL ESQUENAZI** confirmed with Jean Rene Duperval via interstate electronic mail communication and with **CARLOS RODRIGUEZ** that the billing rate for Corporation X would be reduced from $0.15 per minute to $0.07 per minute.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-8
### Violations of the Foreign Corrupt Practices Act
(15 U.S.C. § 78dd-2(a); 18 U.S.C. § 2)

1.    Paragraphs 1 though 14 of the General Allegations and paragraphs 4 through 13 of the Manner and Means section of Count 1 are re-alleged and incorporated by reference as though set forth herein.

2.    On or about the dates set forth below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**JOEL ESQUENAZI,**
**CARLOS RODRIGUEZ,**
**and**
**MARGUERITE GRANDISON,**

who were domestic concerns and officers, employees and agents of domestic concerns within the

19

meaning of the FCPA, willfully made use of, and aided, abetted, and caused others to make use of, the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official, and to any person, while knowing that the money and thing of value will be offered, given, and promised, directly and indirectly, to any foreign official for the purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist defendants **JOEL ESQUENAZI, CARLOS RODRIQUEZ,** and **MARGUERITE GRANDISON,** as well as the General Counsel, Corporation X, and others known and unknown to the Grand Jury, in obtaining and retaining business for and with, and directing business to Corporation X, as follows:

| Count | Approximate Date of Money Transfer | Use of Instrumentality of Interstate Commerce | Intended Foreign Public Official Beneficiary |
|---|---|---|---|
| 2 | November 20, 2003 | Bank transfer of approximately $15,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |
| 3 | December 16, 2003 | Wire transfer of approximately $15,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |
| 4 | December 30, 2003 | Wire transfer of approximately $10,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |

| 5 | January 23, 2004 | Wire transfer of approximately $10,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |
| 6 | February 3, 2004 | Wire transfer of approximately $10,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |
| 7 | February 19, 2004 | Wire transfer of approximately $5,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |
| 8 | March 25, 2004 | Wire transfer of approximately $10,000 from Corporation X's bank account to Telecom Consulting's bank account | Jean Rene Duperval |

In violation of Title 15, United States Code, Section 78dd-2(a), and Title 18, United States Code, Section 2.

## COUNT 9
### Money Laundering Conspiracy
### (18 U.S.C. § 1956(h))

1.     From in or around November 2001, through in or around March 2005, the exact dates being unknown to the Grand Jury, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**JOEL ESQUENAZI,
CARLOS RODRIGUEZ,
ROBERT ANTOINE,
JEAN RENE DUPERVAL,
and
MARGUERITE GRANDISON,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other and with other persons known and unknown to the Grand Jury, including Antonio Perez, Juan Diaz, the General Counsel, Co-conspirators A and B,

21

Corporation X, and Intermediary Companies 1 and 2, to commit offenses under Title 18, United States Code, Sections 1956 and 1957, that is:

(a) knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, to conduct financial transactions affecting interstate and foreign commerce, which financial transactions involved the proceeds of specified unlawful activity, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

(b) to engage in a monetary transaction by, through, and to a financial institution, in and affecting interstate and foreign commerce, in criminally derived property that was of a value greater than $10,000.00, that is, the deposit, withdrawal, transfer and exchange of U.S. currency, funds and monetary instruments, such property having been derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

## PURPOSES OF THE CONSPIRACY

2.       The purposes of the conspiracy were for **JOEL ESQUENAZI, CARLOS RODRIQUEZ, ROBERT ANTOINE, JEAN RENE DUPERVAL** and **MARGUERITE GRANDISON,** and their co-conspirators to conceal the bribe payments paid to **ANTOINE** and **DUPERVAL** by conducting financial transactions with the illegal proceeds in such a manner as to conceal the nature and the source of the proceeds, and to use the illegal proceeds in monetary transactions which were conducted in amounts over $10,000.

## MANNER AND MEANS OF THE CONSPIRACY

3.       Paragraphs 4 through 13 of the Manner and Means section of Count 1 of this

22

Indictment are re-alleged and incorporated by reference herein as a description of the manner and means by which **JOEL ESQUENAZI, CARLOS RODRIGUEZ, ROBERT ANTOINE, JEAN RENE DUPERVAL, MARGUERITE GRANDISON,** and their co-conspirators sought to accomplish the objects and purposes of the conspiracy. Further manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purposes of the conspiracy, included, among other things, the following:

4.    Co-conspirator B would incorporate Intermediary Company 2 in Florida.

5.    Co-conspirator B would open a checking account in the name of Intermediary Company 2 at First Union National Bank, in Miami, Florida.

6.    Juan Diaz, at **ROBERT ANTOINE**'s direction, would disburse the funds from the JD Locator bank account by issuing checks on behalf of **ANTOINE** to Intermediary Company 2.

At **ROBERT ANTOINE's** direction and for his benefit, Juan Diaz would issue the following checks from JD Locator's bank account, which were made payable to Intermediary Company 2 and subsequently given to Co-conspirator B:

| | Check from | Approximate Amount | Memo |
|---|---|---|---|
| 7 | JD Locator | $8,500 | Inv 020747 |
| 8 | JD Locator | $18,500 | Inv 020769 |

9.    Co-conspirator B would deposit these checks from JD Locator into Intermediary Company 2's bank account at First Union National Bank for the benefit of **ROBERT ANTOINE**.

10.    Co-conspirator B would then use **ROBERT ANTOINE's** money that was being held for **ANTOINE** on deposit at Co-conspirator B's First Union National Bank to purchase real property.

23

11.   Co-conspirator B would sell the real property.

12.   Co-conspirator B would deposit approximately $293,394 from the sale of the real property into Co-conspirator B's personal Bank of America bank account.

13.   Co-conspirator B would issue a check made payable to **ROBERT ANTOINE** in the amount of $145,047 from the Bank of America account, which check would be used to purchase a Bank of America cashier's check, made payable to **ANTOINE**, in the amount of $145,032.

14.   **ROBERT ANTOINE** would deposit a Bank of America cashier's check for approximately $145,032 into his Citibank bank account ending in 2501.

15.   It is further alleged that the specified unlawful activities are violations of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2; violations of the criminal bribery laws of Haiti, The Republic of Haiti's Penal Code Articles 137 and 140; and wire fraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 10 - 21
### Money Laundering
### (18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

1.   On or about the dates set forth below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**JOEL ESQUENAZI,**
**CARLOS RODRIGUEZ,**
**JEAN RENE DUPERVAL,**
**and**
**MARGUERITE GRANDISON,**

knowingly conducted and attempted to conduct, and aided and abetted, the following financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of

24

specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and that the financial transactions were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity:

| Count | Approximate Date | Financial Transaction |
|---|---|---|
| 10 | March 1, 2004 | A Telecom Consulting check deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for approximately $8,000 |
| 11 | June 25, 2004 | A Telecom Consulting check caused to be cashed by **JEAN RENE DUPERVAL** for approximately $2,500 |
| Count | Approximate Date | Financial Transaction |
| 12 | July 28, 2004 | A Telecom Consulting check deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for approximately $2,596 |
| 13 | July 29, 2004 | A Telecom Consulting check deposited into **JEAN RENE DUPERVAL's** Wachovia Bank Accounts for approximately approximately $5,473 |
| 14 | August 6, 2004 | A Telecom Consulting check, made payable to a third party, deposited into **JEAN RENE DUPERVAL's** Wachovia Bank Account for approximately approximately $2,518 |
| 15 | August 27, 2004 | A Telecom Consulting check deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for approximately $2,596 |
| 16 | August 27, 2004 | A Telecom Consulting check, made payable to a third party, deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for approximately $2,518 |
| 17 | September 20, 2004 | A Telecom Consulting check deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for approximately $2,596 |

25

| 18 | September 20, 2004 | A Telecom Consulting check, made payable to a third party, deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for approximately $2,518 |
|---|---|---|
| 19 | January 6, 2005 | A Telecom Consulting check caused to be cashed by **JEAN RENE DUPERVAL** for approximately $2,500 |
| 20 | January 6, 2005 | A Telecom Consulting check deposited into **JEAN RENE DUPERVAL's** Miami Federal Credit Union Account for $3,000 |
| 21 | March 29, 2005 | A Telecom Consulting check caused to be cashed by **JEAN RENE DUPERVAL** for $3,000 |

2.  It is further alleged that the specified unlawful activities are violations of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2; violations of the criminal bribery laws of Haiti, The Republic of Haiti's Penal Code Article 137 and 140; and wire fraud, in violation of Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## CRIMINAL FORFEITURE

1.  Paragraphs 1 though 14 of the General Allegations of this indictment and the violations alleged in Counts 1 through 21 of this indictment are re-alleged and incorporated by reference herein for the purpose of alleging forfeiture to the United States of America of property in which one or more of the defendants has an interest.

2.  Upon conviction of any of the offenses alleged in Counts 1 through 8 of this indictment, the defendants so convicted shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to said offense(s).

26

3. Upon conviction of any of the offenses alleged in Counts 9 through 21 of this indictment, the defendants so convicted shall forfeit to the United States any property, real or personal, involved in such offense or any property traceable to such property.

4. The property subject to forfeiture includes but is not limited to:

A. $888,818 in United States currency, representing the amount of proceeds derived from the conspiracy alleged in Count 1;

B. $75,000 in United States currency, representing the amount of proceeds constituting or derived from the offenses alleged in Counts 2 through 8;

C. all money or other property that was the subject of each transaction, transportation, transmission, or transfer, in violation of Title 18, United States Code, Section 1956;

D. all commissions, fees and other property constituting proceeds obtained as a result of a violation of Title 18, United States Code, Section 1956;

E. all property used in any manner or part to commit or to facilitate the commission of a violation Title 18, United States Code, Section 1956; and

F. all property traceable to the money or other property subject to forfeiture under categories C, D and E above.

5. Substitute Asset Provision

If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

A. cannot be located upon the exercise of due diligence;

B. has been transferred or sold to, or deposited with, a third party;

C.   has been placed beyond the jurisdiction of the court;

D.   has been substantially diminished in value; or

E.   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

6.   If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount derived from such offense.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) made applicable hereto by Title 28, United States Code, Section 2461; Title 18, United States Code, Section 982(a)(1) and (b)(2) and the procedures outlined at Title 21, United States Code Section 853, and set forth in Fed. R. Crim. P. 32.2.

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY
Date: November_____, 2009

_____
JEFFREY H. SLOMAN
ACTING UNITED STATES ATTORNEY

_____
Aurora Fagan
Assistant United States Attorney

STEVEN A. TYRRELL, CHIEF
MARK F. MENDELSOHN, DEPUTY CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

28

By: Nicola J. Mrazek
   Trial Attorney

RICHARD WEBER, CHIEF
ASSET FORFEITURE AND MONEY LAUNDERING SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

By: Kevin Gerrity
   Trial Attorney

29