UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 09-21010-CR-MARTINEZ**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

JOEL ESQUENAZI, et al.,

      Defendants.

_____/

## ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL

THIS CAUSE came before the Court upon Defendant Carlos Rodriguez's Motions for

Judgment of Acquittal or New Trial (D.E. Nos. 542, 543). Defendant Joel Esquenazi filed Motions

to Adopt Carlos Rodriquez's Motions for Judgment of Acquittal or New Trial (D.E. Nos. 546, 547)[1]

and a Motion to Adopt Rodriguez's Reply to Government's Response to Docket Entry Number 543

(D.E. No. 586), which this Court grants. After careful consideration and for the reasons set forth

below, the Court denies Defendants' motions.

## I.    Background

On December 4, 2009, a federal grand jury returned a 21-count indictment against Joel

Esquenazi, Carlos Rodriguez, Robert Antoine, Jean Rene Duperval and Marguerite Grandison (D.E.

No. 3). Count 1 charged Esquenazi, Rodriguez, and others with conspiring to violate the Foreign

---

[1]Esquenazi moved to adopt docket entry number 542 as it relates to the Motion for New
Trial only, excepting the argument regarding severance, and docket entry number 543 in its
entirety. *See* (D.E. Nos. 546, 547). This Court will address only those arguments timely made in
Rodriguez's Motions. *See United States v. Bramlett*, 116 F.3d 1403, 1405-06 (11th Cir. 1997).

Corrupt Practices Act ("FCPA") and to commit wire fraud, in violation of 18 U.S.C. § 371. Counts 2-8 charged Esquenazi, Rodriguez, and others with substantive FCPA offenses, in violation of 15 U.S.C. § 78dd-2 and 18 U.S.C. § 2. Count 9 charged Esquenazi, Rodriguez, and others with conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h). Counts 10-21 charged Esquenazi, Rodriguez, and others with substantive money laundering offenses, in violation of 18 U.S.C. §§ 1956 (a)(1)(B)(i) and 18 U.S.C. § 2.

Antoine pleaded guilty (D.E. No. 132), and the trial of Esquenazi and Rodriguez was severed from that of Duperval and Grandison. (D.E. No. 394).

On July 12, 2011, a federal grand jury returned a 28-count superseding indictment against Washington Vasconez Cruz, Amadeus Richers, Cinergy Telecommunications, Inc., Patrick Joseph, Jean Rene Duperval, and Marguerite Grandison. (D.E. No. 419).

Defendants Esquenazi and Rodriguez were convicted by jury on August 4, 2011 on all counts of the indictment, including conspiring to violate the FCPA and to commit wire fraud and for violation of money laundering statutes. (D.E. Nos. 522, 523).

A.      **Evidence At Trial Regarding Agreements.**

As accurately stated by the Government in its Consolidated Response in Opposition to Defendant's Motion for Judgment of Acquittal or New Trial (D.E. No. 561):[2]

> The Government introduced voluminous documentary evidence showing that the defendants entered into a similar agreement with Jean Rene Duperval, one of Antoine's successors as [Telecommunications D'Haiti's ("Teleco")] Director of International Relations. Duperval agreed to reduce [Terra Telecommunication's ("Terra")] rates after Terra agreed to make

---

[2]The Court was present at the trial and checked the Government's citations and found them to be accurate.

"consulting" payments to Telecom Consulting Services ("TCS"), a company which was incorporated by Terra's in-house attorney, James Dickey, on behalf of Duperval's sister, Marguerite Grandison, and whose bank account was set up by Terra's personal banker. *See, e.g.*, Gov. Exs. 2- 21, 127-137, 198-202, 601. Rodriguez set up recurring wire payments to TCS and authorized the majority of the "consulting" payments, which Grandison distributed to Duperval. *See, e.g.*, Gov. Exs. 2-21, 128, 603. . . . .

[t]he Government's witnesses confirmed the details of these illegal agreements. Cooperating co-conspirators Robert Antoine, Jean Fourcand, and Juan Diaz testified that Esquenazi agreed with Antoine on the kickback scheme described above and that Fourcand and Diaz, along with other Antoine associates, agreed to launder the kickback payments by receiving checks and calling cards from Terra on Antoine's behalf. *See, e.g.*, Tr. 7/26/2011 AM pp. 34-35 (Antoine explaining his discussions with Esquenazi regarding the kickback scheme); Tr. 7/19/2011 AM pp. 69-70 (Diaz explaining that he agreed to launder the kickback payments from Terra to Antoine).  Antoine explained that, per Esquenazi's instructions, he met with Antonio "Tony" Perez, Terra's controller, over lunch to work out the details of how the kickbacks would be paid. Tr. 7/26/2011 AM p. 36. After Terra fired Perez in January 2002, Antoine discussed the kickback arrangements with Esquenazi. Tr. 7/26/2011 PM p. 89.

Tony Perez corroborated Antoine's testimony and confirmed that Rodriguez and Dickey also agreed to pay kickbacks to Antoine in exchange for reductions in the amounts Terra owed Haiti Teleco and for not disconnecting Terra's service despite non-payment. Perez explained that, around October 2001, Esquenazi instructed him to ask Antoine to agree to amortize Terra's debt to Haiti Teleco and, if that did not work, "to offer Antoine a side payment." Tr. 7/22/2011 AM pp. 74-76. During a lunch meeting, Antoine rejected Perez's amortization request but agreed to accept "side payments" laundered through third-party intermediaries. *Id.* Perez testified that he reported back on this lunch meeting to Esquenazi, Rodriguez, and Dickey:

> [A]fter that meeting, I mean, you know, I felt good.
> I felt like I made a huge contribution to the
> company, so I went back to my office and I had

> some stuff to do.  And you know, later that
> afternoon, I ended back in Joel's office and James
> Dickey and Carlos Rodriguez were there and, you
> know, basically the news of that deal was shared
> with them.

Tr. 7/22/2011 AM pp. 79-81. Perez explained that he discussed
with Esquenazi, Rodriguez, and Dickey "the fact that Robert
Antoine had accepted an arrangement to accept, you know,
payments to him in exchange for reducing our bills" and their
reactions to his report: "Well, [Esquenazi] was happy, and both
James Dickey and Carlos Rodriguez also congratulated me on a job
well done." Tr. 7/22/2011 AM pp. 79-81. Perez also explained the
advice he received from Dickey when he later expressed his
concern that they had entered into an illegal arrangement:

> James Dickey said, look Tony, you have nothing to
> worry [about], you're not an officer of the company,
> you're not an owner of the company, you don't have
> signatory authority to sign checks, to sign wires, to
> sign anything, you cannot bind the company
> contractually with your signature, you have nothing
> to worry about.  This is Joel's and Carlos['s]
> problem. This is their decision, this is not your
> decision, don't worry about it.

Tr. 7/22/2011 AM pp. 79-[82].

The testimony of Terra accountant Jose Arroliga
corroborated the testimony of the cooperating co-conspirators. For
example, Juan Diaz testified that the "Consulting Agreement" he
entered into with Terra (Ex. 301) was a sham contract created so
that Terra would "have some documentation as to why money was
being paid to [his company,] JD Locator." Tr. 7/19/2011 AM pp.
[83-85]. Diaz never submitted invoices to justify the payments to
him, even though the contract, which was signed by Rodriguez,
required him to do so. Tr. 7/19/2011 AM pp. 80-81; Ex. 301 ¶ 7.
Arroliga, who was responsible for Accounts Payable at Terra,
confirmed that Terra never received any back-up documentation
for the payments to JD Locator or any of the other third party
"consultants." Tr. 7/20/2011 PM pp. 56-57, 60, 70, 76-77, 79, 82.
Arroliga explained that the manner in which payments to JD
Locator were initiated—by "check request" and without backup

> documentation—was "unusual" and not "normal." Tr. 7/21/2011
> PM pp. 13, 15-17. Moreover, Arroliga testified, Rodriguez
> authorized the majority of the payments to JD Locator, A&G
> Distributors, and Telecom Consulting, three of the companies
> Terra used to launder funds to Teleco officials. *Id.*

(D.E. No. 561 at 2-5).

### B.    Evidence At Trial Regarding Teleco As A Public Entity.

As accurately stated by the Government in its Consolidated Response in Opposition to

Defendant's Motion for Judgment of Acquittal or New Trial (D.E. No. 561), the Government

called Gary Lissade to testify regarding Haitian law and public institutions:

> In support of the allegations regarding the FCPA and Haitian
> bribery law, the Government called Gary Lissade, Haiti's former
> Minister of Justice and the author of a book on Haiti's public
> administration, as an expert in Haitian law and Haitian public
> institutions.[1] Tr. 7/25/2011 PM pp. 34-37. Mr. Lissade explained
> that Teleco was widely considered to be a Haitian public entity
> during the relevant time period and that he had classified Teleco as
> part of the public administration in his 2000 book. *Id.* pp. 60, 61,
> 95, 97.
>
> FN1: Mr. Lissade explained that he conducted extensive research,
> including legal research and interviews, in reaching his
> conclusions. *See, e.g.*, Tr. 7/25/2011 PM pp. 38, 82-83.
>
> Mr. Lissade explained that Teleco was established as a private
> institution in 1968 but became a public entity when, around
> 1971-72, the state-owned National Bank of the Republic of Haiti
> ("BNRH") acquired 97% of its shares. *Id.* pp. 38, 40, 68. Mr.
> Lissade conceded that the exact time and circumstances of this
> acquisition were unclear but explained that the Government's
> actions and official documents from the time period reflected that
> the acquisition and assumption of control had occurred. *Id.* pp.
> 80-81, 96. Mr. Lissade also conceded that, although Teleco began
> to use the term "S.A.M," rather than "S.A.,"[2] to reflect its partial
> state-ownership after the acquisition, Teleco never underwent any
> legal process to change its name. *Id.* pp. 41-42, 96.

FN2: Mr. Lissade noted that S.A. designates a private corporation in Haiti and that the addition of the initial "M." indicates that the corporation is a mixed public/private enterprise.

Mr. Lissade testified that Teleco was 97% owned and 100% controlled by the BNRH's successor, the state-owned Bank of the Republic of Haiti ("BRH"), for many years, including during the time period charged in the indictment. *Id.* pp. 40-41, 49, 60, 95, 96. Teleco was run by a board of directors and a general director, all of whom were appointed by executive order signed by Haiti's President, Prime Minister, and relevant Ministers. *Id.* pp. 42, 44. The people who worked under these political appointees were considered to be "public agents" working for the "public administration," *id.* pp. 61-62, which Mr. Lissade defined as "the entities that the state use[s] to perform and to give services to the people living in Haiti" and "as an instrument . . . for the state to reach its missions and objectives and goals." *Id.* pp. 36. Teleco was entitled to special treatment under Haitian tax laws, and its revenues were controlled by the BRH. *Id.* pp. 49, 53.

Mr. Lissade further testified that Haiti's bribery laws applied to Teleco officials during the relevant time period. *Id.* pp. 56-57. In 2008, Haiti passed an asset disclosure law, intended to combat public corruption, that required certain employees of Teleco and other public institutions to declare their assets, further confirming Mr. Lissade's opinion that Teleco had been considered a public entity during the relevant time period. *Id.* pp. 58-59, 60, 95.

Mr. Lissade also explained that, in 1996, Haiti passed a modernization law intended to privatize certain state-owned companies, including Teleco, but Teleco did not actually become partially privatized until 2009-2010. *Id.* pp. 54-55.

Mr. Lissade's testimony that Teleco was owned and controlled by the Haitian government was corroborated by numerous witnesses and voluminous documentary evidence. For example:

• Robert Antoine testified that Teleco was a state-owned company and that, when he worked there, he was a government employee whose supervisor, Patrick Joseph, had been appointed by the President of Haiti (Tr. 7/26/2011 AM pp. 11-12, 13, 15);

• Jean Fourcand testified that the President of Haiti appointed his

cousin, Patrick Joseph, as General Director of Teleco, the "state owned" "national phone company" of Haiti (Tr. 7/21/2011 PM pp. 31-32);

• Juan Diaz testified that he learned while living in Haiti that Teleco was a "nationalized" company owned by the Haitian government (Tr. 7/19/2011 AM p. 64);

• Antonio Perez testified that Esquenazi, Dickey, and Terra's business partners at HAWAI told him that Haiti Teleco was owned and operated by the Haitian government and that he saw an Aon insurance application submitted by Terra to that effect (Tr. 7/25/2011 AM pp. 70-71); and

• John Marsha, who worked at Aon, testified that Esquenazi, Rodriguez, and Dickey told him that the contract they wanted to insure was with a foreign government and that the type of insurance they requested applied only to government contracts. Tr. 7/27/2011 AM pp.7 -8.

*See also, e.g.,* Gov. Exs. 91-97, 185-187 (Aon insurance documents); Gov. Exs. 451T-453T (executive orders appointing Teleco officials).

(D.E. No. 561 at 5-8).

## II.  **Standard of Review**

Defendants move for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Rule 29 permits a guilty verdict to be set aside and judgment of acquittal to be entered if there is insufficient evidence to sustain the verdict. *U.S. v. Williams*, 390 F.3d 1319, 1323 (11th Cir. 2004). The evidence must support that the defendant was guilty beyond a reasonable doubt and must be examined in a light most favorable to the Government. *Id.* "All credibility choices must be made in support of the jury's verdict." *Id.*

Defendants move for a new trial under Federal Rule of Criminal Procedure 33.[3]  This rule permits a Court to vacate a judgment and "grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33.  Such motions are "granted only with great caution." *U.S. v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006).  To grant a Rule 33 motion, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *U.S. v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985).  These motions are granted only in exceptional cases.  *Id.*   A new trial based on newly discovered evidence "is warranted only if: (1) the evidence was in fact discovered after trial; (2) the defendant exercised due care to discover the evidence; (3) the evidence was not merely cumulative or impeaching; (4) the evidence was material; and (5) the evidence was of such a nature that a new trial would probably produce a different result." *U.S. v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005).

## III.   Analysis

### A.    Evidence to Establish Guilt.[4]

Rodriguez first argues that the "evidence failed to prove Carlos Rodriguez knew of the existence of the conspiracy charged in Count I of the Indictment, that Rodriguez committed a violation of the FCPA as charged in Counts 2 through 8 of the Indictment, or that Carlos Rodriguez knowingly laundered funds derived from the offenses charged in the Indictment as charged in Counts 9 through 21 of the Indictment." *See* (D.E. No. 542 at 1-2).

Rodriguez was the Executive Vice President of Terra and Esquenazi was the President

---

[3]Esquenazi moved to adopt Rodriguez's Motion for New Trial with the exception of the argument regarding severance. *See* (D.E. No. 546).

[4]Esquenazi did not move to adopt this portion of Rodriguez's motion. *See* (D.E. No. 546).

and CEO.  Mr. Rodriguez argues that only one witness at trial, Tony Perez, the controller of

Terra, claimed that Mr. Rodriguez knew of the existence of an agreement to pay Robert Antoine,

the Director of International Relations for Teleco, to receive side payments in exchange for

reductions of the invoices owed to Teleco.  *Id.*  He claims Mr. Perez's testimony was heavily

impeached at trial.  *Id.*

This Court disagrees.  As discussed in Section I(A), above, the Government produced

documentary evidence as well as witness confirmation (in addition to the testimony of Tony

Perez which was corroborated by documentary evidence and witness testimony) regarding the

agreements between Defendants and Teleco executives.  Additionally, as accurately stated by the

Government in its Consolidated Response in Opposition to Defendant's Motion for Judgment of

Acquittal or New Trial (D.E. No. 561), the following was shown by the Government at trial:

> At trial, the Government produced both direct and circumstantial
> evidence to support the jury's verdict against Rodriguez on all
> counts.  For example, Perez provided direct evidence that
> Rodriguez knew about and joined the conspiracy charged in Count
> 1.  Perez testified that he specifically told Rodriguez (as well as
> Esquenazi and Dickey) that Antoine agreed to "accept ...
> payments to him in exchange for reducing [Terra's] bills" and that
> Rodriguez then "congratulated [Perez] on a job well done." Tr.
> 7/22/2011 AM pp. 79-[82].  Perez further testified that Dickey told
> him that it was ultimately Rodriguez's and Esquenazi's decision to
> bribe Antoine.  *Id.*  Perez's testimony was corroborated by ample
> documentary evidence.  *See, e.g.*, Gov. Exs. 101, 115-116,
> 119, 148.
>
> Following this conversation, Rodriguez authorized the majority of
> the payments to the thirdparty intermediaries who were used to
> launder the bribes paid to Antoine and his successor, Duperval.
> *See, e.g.*, Tr. 7/21/2011 PM pp. 16-17 (Arroliga testifying that
> Rodriguez authorized the majority of the payments).  Bank and
> business records showed that Rodriguez signed 17 checks and
> authorized nine wire transfers to the third-party intermediaries;

requested via check request forms and emails that checks be cut the third-party intermediaries; sent a letter canceling calling card debt owed by one of the third-party intermediaries; and signed the sham JD Locator "Consulting" Agreement, under which hundreds of thousands of dollars in bribe payments to Antoine were laundered. *See, e.g.*, 2-21, 128, 603. The testimony of Terra's accountant, Jose Arroliga, was particularly powerful in establishing that Rodriguez knew about the illicit nature of these payments: Arroliga testified that Rodriguez paid close attention to Terra's finances, decided which vendors to pay, and, by taking the "unusual" step of issuing check requests, instructed Terra's employees that no backup documentation was required to justify these payments. Tr. 7/21/2011 PM pp. 3-4, 13, 15-17; Tr. 7/20/2011 PM pp. 41-42, 47-48, 56-57, 60, 70, 76-77, 79, 82. Similarly, Juan Diaz testified that Rodriguez signed the "Consulting" Agreement but never required him to submit any invoices and never asked him about his qualifications to perform the work described in the contract. Tr. 7/19/2011 AM pp. 77-81.

The testimony of Perez and John Marsha and the related Aon insurance documents, showed that Rodriguez knew that Teleco was owned by the Haitian government. Tr. 7/27/2011 AM pp.7-8; Tr. 7/25/2011 AM pp. 70-71; Gov. Exs. 91-97, 185-187.

(D.E. No. 561 at 12, 13).

The evidence at trial was sufficient to support the jury's verdict of guilty beyond a reasonable doubt and also weighed heavily in favor of the jury's verdict. This is not a case in which the interests of justice require that the jury's verdict be set aside. The evidence supports the jury's verdict that Rodriguez was guilty beyond a reasonable doubt.

**B.   Jury Instructions.**

Defendants also argue that the Court erred in instruction the jury.

**1.   Statute of Limitation Instruction.**

Defendants first argue the Court "improperly denied the defense requested instructions regarding the running of the statute of limitations . . . ." *See* (D.E. No. 542 at 4). All counts of

the indictment have a five year statute of limitations.  18 U.S.C. § 3282.  However, tolling is

permitted pursuant to 18 U.S.C. § 3292 when a request is made to a foreign country in order to

obtain evidence of the offense contained in that country.

> Upon application of the United States, filed before return of an
> indictment, indicating that evidence of an offense is in a foreign
> country, the district court before which a grand jury is impaneled to
> investigate the offense shall suspend the running of the statute of
> limitations for the offense if the court finds by a preponderance of
> the evidence that an official request has been made for such
> evidence and that it reasonably appears, or reasonably appeared at
> the time the request was made, that such evidence is, or was, in
> such foreign country.

18 U.S.C. § 3292(a)(1).  "[A] period of suspension under this section shall begin on the date on

which the official request is made and end on the date on which the foreign court or authority

takes final action on the request." 18 U.S.C. § 3292(b).  The suspension is limited to three years

and cannot exceed six months if final action by the foreign government is taken before the statute

of limitations would have otherwise expired.  18 U.S.C. § 3292(c).

     This Court permitted tolling pursuant to 18 U.S.C. § 3292 based upon the Office of

International Affairs of the United States Department of Justice's official request to an "authority

of a foreign country" in the Republic of Haiti on July 29, 2008.  Accordingly, all conduct from

and after July 31, 2003 would be within the five-year statute of limitations.  This includes all

counts in the Indictment since all occurred after July 31, 2003.

     Defendants filed a motion to dismiss the indictment on statute of limitations grounds

(D.E. No. 171) and challenged this Court's Order tolling the statute of limitations. (D.E. No. 204-

2).  Defendants' motion to dismiss was denied. (D.E. No. 240).

     Defendants attempted to introduce a jury instruction relating to the statute of limitations

and tolling.  However, the validity of tolling orders are decided by judges and not juries and, as

such, Defendants' proposed instruction regarding the statute of limitations was properly rejected.

*See United States v. Hudson*, 982 F.2d 160, 163 (5th Cir. 1993) (finding that claim presenting

question of law is a question for the court, not question of fact for jury).

This Court properly determined the relevant date for the statute of limitations based on

its tolling order and properly instructed the jury regarding same.  *See* (D.E. No. 20 at 14).

Because all counts occurred within the limitations period, there was no legal basis for providing a

statute of limitations instruction as to the remaining substantive counts.

### 2.      FCPA Instrumentality.

Defendants next argue the Court's instruction regarding a state owned enterprise pursuant

to the FCPA was incorrect.  (D.E. No. 542 at 4).  Specifically, "whether the state owned

enterprise the Government witnesses claimed existed in this case qualified based upon the

charges in the Indictment."  *See Id.*  This Court instructed the jury that:

> An "instrumentality" of a foreign government is a means or agency
> through which a function of the foreign government is accomplished.
> State-owned or state-controlled companies that provide services to the
> public may meet this definition.  To decide whether
> Telecommunications D'Haiti or Teleco is an instrumentality of the
> government of Haiti, you may consider factors including but not
> limited to:
>
> > (1) whether it provides services to the citizens and inhabitants
> > of Haiti;
> >
> > (2) whether its key officers and directors are government
> > officials or are appointed by government officials;
> >
> > (3) the extent of Haiti's ownership of Teleco, including whether
> > the Haitian government owns a majority of Teleco's shares or
> > provides financial support such as subsidies, special tax

-12-

> treatment, loans, or revenue from government-mandated fees;
>
> (4) Teleco's obligations and privileges under Haitian law, including whether Teleco exercises exclusive or controlling power to administer its designated functions; and
>
> (5) whether Teleco is widely perceived and understood to be performing official or governmental functions.
>
> These factors are not exclusive, and no single factor will determine whether Telecommunications D'Haiti or Teleco is an instrumentality of a foreign government.  In addition, you do not need to find that all the factors listed above weigh in favor of Teleco being an instrumentality in order to find that Teleco is an instrumentality.

(D.E. No. 520 at 23, 24)

This Court properly instructed the jury through a non-exclusive multi-factor definition that permitted the jury to determine whether Teleco was an instrumentality of a foreign government. *See* (D.E. No. 520 at 23, 24).

### 3.   Deliberate Ignorance.

Defendants, with nothing more, generally allege that "the Court erred in instructing the jury on deliberate ignorance." (D.E. No. 542 at 4).  The Court's jury instructions included two references to deliberate ignorance.  Within the FCPA instruction, the Court's instruction tracked the language of 15 U.S.C. § 78-dd-2(h)(3)(B) stating that:

> [A] person's state of mind is "knowing" with respect to conduct, a circumstance, or a result if (a) such person is aware that such person is engaging in such conduct, that such circumstance exists, or that such result is substantially certain to occur; or (b) such person has a firm belief that such circumstance exists or that such result is substantially certain to occur.  A person is deemed to have such knowledge if the evidence shows that he or she was aware of a high probability of the existence of such circumstance, unless he or she actually believes that such circumstance does not exist.

-13-

(D.E. No. 520 at 26).

The Court's jury instruction on general deliberate ignorance was proper and followed

Eleventh Circuit Pattern Special Instruction 8 stating that:

> If a Defendant's knowledge of a fact is an essential part of a crime, it's enough that the Defendant was aware of a high probability that the fact existed – unless the Defendant actually believed the fact didn't exist.
>
> "Deliberate avoidance of positive knowledge" – which is the equivalent of knowledge – occurs, for example, if a defendant engages in a financial transaction and believes the money or property involved in the transaction were the proceeds of an unlawful activity but deliberately avoids learning that the money or property did come from an unlawful activity so he can deny knowledge later.
>
> So you may find that a defendant knew about the unlawful activity if you determine beyond a reasonable doubt that the defendant (1) actually knew about the unlawful activity, or (2) had every reason to know but deliberately closed his eyes.
>
> But I must emphasize that negligence, carelessness, or foolishness isn't enough to prove that a Defendant knew about the unlawful activity.

(D.E. No. 520 at 36).

Including instructions as to deliberate ignorance was proper based on the factual predicate

established during trial.  "[A] deliberate ignorance instruction is appropriate when the facts

support the inference that the defendant was aware of a high probability of the existence of the

fact in question and purposely contrived to avoid learning all of the facts in order to have a

defense in the event of a subsequent prosecution."  *U.S. v. Patterson*, 231 F. App'x 878, 885

(11th Cir. 2007) (quoting *United States v. Perez-Tosta*, 36 F.3d 1552, 1564 (11th Cir.1994)).

"The instruction is properly given if the evidence supports both actual knowledge and deliberate

ignorance." *Id.*   (citing *U.S. v. Arias*, 984 F.2d 1139, 1143 (11th Cir. 1993)).

Although direct evidence was presented to establish Defendants' actual knowledge of the bribery scheme (*see, e.g.,* Tr. 7/21/11 PM pp. 3-4, 16-17; Tr. 7/22/2011 AM pp. 79-82), evidence was also adduced regarding deliberate ignorance including payments to specific parties without requiring the company's normal backup documentation to support the payments.  (*See e.g.,* Tr. 7/21/2011 PM pp. 3-4, 13, 15-17; Tr. 7/20/2011 PM pp. 41-42, 47-48, 56-57, 60, 70, 76-77, 79, 82).  Accordingly, it was proper to instruct the jury on deliberate ignorance.  *See* 15 U.S.C. § 78-dd-2(h)(3)(B); *see also Patterson,* 231 F. App'x at 885.

## C.   Pre-Trial Rulings.

Defendants also move for a new trial based on several pre-trial rulings made by the Court.

### 1.   Severance.[5]

Rodriguez moved to sever his trial from that of co-defendant Esquenazi based on: (i) Esquenazi's "pre-arrest statements that inferentially inculpate" Rodriguez; (ii) inconsistent defenses that "suggest a heightened risk of prejudice" to Rodriguez; and (iii) the theory that Esquenazi would "exercise his Fifth Amendment rights at his trial" but would subsequently testify truthfully to "clarify his pre arrest statements as well as affirmatively exculpate" Rodriguez in a separate trial. *See* (D.E. No. 181 at 1-2).

"There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. U.S.*, 506 U.S. 534, 537 (1993).  This rule is particularly applicable to conspiracy cases.  *United States v. Cassano*, 132 F.3d 646, 651 (11th Cir. 1998).  Joint trials

---

[5]Esquenazi did not join in that portion of Rodriguez's motion relating to severance.  *See* (D.E. No. 546).

promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* (citing *Richardson v. March,* 481 U.S. 200, 210 (1987)). "[A] district court should grant a severance under Rule 14 [of the Federal Rules of Criminal Procedure] only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment of guilt or innocence. *Id.* at 539. This Court properly denied Rodriguez's motion for severance. *See* (D.E. No. 239).

### i.      *Bruton* Argument.

Rodriguez alleged that Esquenazi's pre-arrest statements "inferentially inculpate" Rodriguez and thus create a basis for severance under *Bruton v. United States*, 391 U.S. 123 (1968). (D.E. No. 181 at 1, 6-10). *Bruton* provides that limiting instructions to the jury should be used directing that the statements only be used against the co-defendant unless the co-defendant's statement is so "powerfully incriminating" against the non-testifying defendant that the jury is unable to follow limiting instructions. *See Bruton*, 391 U.S. at 135-36. *Bruton* excludes "only those statements by a non-testifying defendant which directly implicate a co-defendant." *United States v. Beale*, 921 F.2d 1412, 1425 (11th Cir. 1991).

The statements referenced in Rodriguez's *Bruton* argument do not directly implicate Rodriguez.[6]  These statements alone are not incriminating and are not properly excluded under *Bruton*.

---

[6] These statements include: (i) a 2006 statement by Esquenazi stating that Rodriguez "had more knowledge regarding the expenses [of Terra] than he did;" (ii) a 2009 statement by Esquenazi regarding Rodriguez confronting a contact at Teleco regarding payments; and (iii) Esquenazi's deposition from Terra's bankruptcy proceeding. *See* (D.E. No. 181 at 2-3).

ii.        **Inconsistent Defenses.**

Rodriguez asserted that his trial defenses and Esquenazi's trial defenses were mutually antagonistic. (D.E. No. 181 at 1, 10-11). To justify severance "[t]he defenses of co-defendants must be antagonistic to the point of being mutually exclusive." *United States v. Castillo-Valencia*, 917 F.2d 494, 498 (11th Cir. 1990). In reviewing denial of a motion for severance, a court will ask:

> (1) Do the alleged conflicts with co-defendants' defenses go to the essence of the appellant's defense?
>
> (2) Could the jury reasonably construct a sequence of events that accommodates the essence of both defendants' defenses?
>
> (3) Did the conflict subject the appellant to compelling prejudice?
>
> (4) Could the trial judge ameliorate the prejudice?

*Id.*

Rodriguez asserted that he "signed the preponderant amount of checks that went to the 'shell corporations' cited in the Indictment" (D.E. No. 181 at 3) and that "he did so at the orders of . . . Esquenazi." *Id.* Rodriguez claimed he did not know about the bribery scheme because his "role did not require him to have knowledge of the details of the relationship with Haiti Teleco." *Id.* at 4. Esquenazi's defense would be that no bribery occurred. These defenses are not mutually antagonistic. Hypothetically, the jury could have determined that the bribery did occur, but that, consistent with his defense, Rodriguez was unaware of it. As such, the defenses do not conflict. Severance on the grounds of inconsistent defenses was not appropriate.

iii.        ***Byrd* Grounds.**

Rodriguez based his next argument on *Byrd v. Wainwright*, 428 F.2d 1017 (5th Cir.

1970). Rodriguez argues that Esquenazi would "exercise his Fifth Amendment rights at his trial" but would subsequently testify truthfully to "clarify his pre arrest statements as well as affirmatively exculpate" Rodriguez in a separate trial. (D.E. No. 181 at 2, 11-17).

In order to sever, a codefendant must show: "(1) a bona fide need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the codefendant would indeed have testified at a separate trial." *United States v. Machado*, 804 F.2d 1537, 1544 (11th Cir. 1986). "Once the defendant makes that threshold showing, the trial court must then: (1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider judicial administration and economy; and (4) give weight to the timeliness of the motion." *Id.*

In his motion for severance, Rodriguez asserted that Esquenazi could "testify as to the lack of participation and knowledge of the Defendant with regard to the alleged bribery scheme." (D.E. No. 181 at 17). He speculated that Esquenazi would not testify at a joint trial, and that Esquenazi would testify at a separate, subsequent trial that Rodriguez was not involved in the bribery scheme. These unsupported assertions do not show prejudice under *Byrd* and severance on these grounds is not proper.

### 2.     Spoliation.

Next, Defendants assert that the motion to dismiss for spoliation of evidence (D.E. No. 193) was improperly denied. (D.E. No. 542 at 4). This Court disagrees.

On February 22, 2005, Terra filed for bankruptcy in the Southern District of Florida. *In Re Terra Telecommunications Corp.*, 05-BKC-11212. On April 21, 2009, the trustee filed a

-18-

motion with the bankruptcy court to approve the abandonment, destruction, and disposal of

Terra's records. (D.E. No. 208-3). The bankruptcy court issued an order granting the motion and

ordering the trustee to serve copies of the order on all interested parties. (D.E. No. 208-5). The

bankruptcy trustee filed a certificate of service that the order had been electronically transmitted

to those on the electronic mail notice list. (D.E. No. 208-6). The electronic mail notice list

included Terra's corporate lawyer and Esquenazi and Rodriguez's personal attorney. No

objections were made by Terra, Esquenazi or Rodriguez to the document destruction even though

they were aware of the Government's investigation relating to this action. The Government

asserts that neither the Department of Justice nor the Internal Revenue Service - Criminal

Investigation Division received notice of the destruction. (D.E. 225 at 2). They were not

included on the electronic mail notice list. (D.E. No. 208-2).

### i.    Government Action.

Defendants claimed that the bankruptcy trustee was a member of the government and

improperly destroyed the documents. (D.E. No. 193 at 5, Exs. 3, 4). A defendant's constitutional

due process rights are implicated when dealing with destruction or loss of evidence. *See United*

*States v. Nabors*, 707 F.2d 1294, 1296 (11th Cir. 1983). In ruling on a motion to dismiss for

spoliation of evidence, a court must first consider whether the constitutional violations occurred

through government actors rather than private third parties. *Colorado v. Connelly*, 479 U.S. 157,

165 (1986) (stating that it is "settled law requiring some sort of 'state action' to support a claim of

violation of the Due Process Clause of the Fourteenth Amendment.").

Here, the bankruptcy trustee was responsible for destruction of the evidence. (D.E. No.

193 at 4; D.E. No. 208-3, 4). A bankruptcy trustee is not a government employee or agent.

-19-

*Cromelin v. United States*, 177 F.2d 275, 277 (5th Cir. 1949). "The trustee, like a receiver, is an officer of court, appointed by the court, directed by the court, and paid by the court from the funds in the court. He is in no sense an agent or employee or officer of the United States." *Id.*

Also, the bankruptcy trustee acted on his own and without the knowledge of the Government. *See United States v. Simpson*, 904 F.2d 607 (11th Cir. 1990). He did not act as an agent of the Government. " [A] trustee or agent to a trustee is only subject to the Fourth Amendment if (1) the government knew of and acquiesced in the conduct and (2) the trustee acted with the intent to assist the government in its investigatory or administrative purposes." *In re Kerlo*, 311 B.R. 256, 265 (Bankr. C.D. Cal. 2004). Because the Government was without knowledge of the bankruptcy order on the destruction of documents, *see* (D.E. No. 208-2), it did not know of or acquiesce in the conduct of the bankruptcy trustee in destroying the documents, and the trustee did not act with the intent to assist the government in its investigation.

Even if the bankruptcy trustee acted as an agent of the Government, which the Court does not agree, Defendants must show the destroyed evidence meets the standard of constitutional materiality, *see California v. Trombetta*, 467 U.S. 479, 489 (1984), and that the destruction of evidence shows bad faith on the part of the Government. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

> To meet this standard of constitutional materiality, *see United States v. Agurs*, 427 U.S., at 109–110, 96 S.Ct., at 2400, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Neither of these conditions is met on the facts of this case.

*Trombetta*, 467 U.S. at 489. Defendants' receiving notice of the destruction of evidence and their

failure to make any objection or take any action to preserve the evidence demonstrates that the standard of constitutional materiality was not met.

Additionally, Defendants cannot prove bad faith on behalf of the Government because the Government was not even aware of the document destruction.  As such, the motion to dismiss for spoliation of evidence was properly denied.

### 3.   Failure to State a Criminal Offense.

Defendants moved the Court to dismiss the indictment for failure to state a criminal offense.  (D.E. No. 273).  Federal Rule of Criminal Procedure 7(c)(1) provides that "[t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." FED. R. CRIM. P. 7(c)(1).  Further,

> [t]he true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.

*Hagner v. United States*, 285 U.S. 427, 431 (1932).

Here, the Indictment states every element of the offense and descriptive information regarding the overt acts.  *See* (D.E. No. 3).  The Indictment makes Defendants aware of the offenses for which they must defend, and Defendants' motion to dismiss the Indictment for failure to state a criminal offense was properly dismissed.

### 4.   Statute of Limitations.

Finally, Defendants assert that the Court improperly denied their motion to dismiss regarding expiration of the statute of limitations and instructions to the jury regarding same.

(D.E. No. 542 at 5).  For the reasons stated in Section III(B)(1), this Court properly instructed the jury regarding the statute of limitations, tolling and expiration of the statute of limitations.

### D.      Rule 44 Objections.

Next, Rodriguez argues that the Court's "admission of foreign records [at trial] failed to satisfy Rule 44, Fed. R. Civ. Pro. and 18 U.S.C. § 3505(a)(1)(A)-(D)." (D.E. No. 542 at 5). Rodriguez asserted objections at trial that documents sent to Terra from Teleco (which documents included Terra Bates labels) should be excluded pursuant to Federal Rule of Civil Procedure 44 and 18 U.S.C. § 3505. *See* Tr. 7/19/2011 PM pp. 123-138.  These documents consisted of invoices received from Teleco which were used by Terra for internal purposes including invoice payment.  Tr. 7/20/2011 AM pp. 8-9.

In *United States v. Parker*, 749 F.2d 628, 633 (11th Cir. 1984), the court admitted into evidence customs certificates for spirits that were not prepared by the testifying witness or his company.  To be admitted into evidence under the business record exception to the hearsay rule, "the person who actually prepared the documents need not have testified so long as other circumstantial evidence and testimony suggest their trustworthiness." *Id.* (citing *Itel Capital Corp. v. Cups Coal Co.*, 707 F.2d 1253, 1259 (11th Cir. 1983)).  "Nor is it required 'that the records be prepared by the business which has custody of them.'" *Id.* (citing *United States v. Veytia-Bravo*, 603 F.2d 1187, 1191-92 (5th Cir. 1979)).

Evidence may be admitted under Federal Rule of Evidence 803(6) even if the witness and his company did not prepare the records, nor had first-hand knowledge of preparation of the records. *Id.*  So long as there is evidence of trustworthiness of the records and that they were prepared in the usual course of business, such records are admissible. *Id.*  Specifically, when a

firm takes custody of a document, that document is "made" by the firm for purposes of Rule 803(6). *United States v. Adefehinti*, 510 F.3d 319, 326 (D.C. Cir. 2007). If a company "acquired, used and filed" a document created by another party, then that document becomes the company's business record. *Id.* at 327.

Here, the Government established that Terra used the Teleco records for internal purposes, such as paying invoices, and kept them in their corporate records. Tr. 7/20/2011 AM pp. 8-9. These documents became Terra's business records and were properly introduced at trial. *See Parker*, 749 F.2d at 633.

### E.     Bellerive Declaration.

Defendants raise the issue of the declaration of Jean Max Bellerive, the current Prime Minister of Haiti, and assert it provides newly discovered evidence that Teleco was not an instrumentality of the Haitian government. (D.E. Nos. 543, 566, 580, 581) Defendants believe the Bellerive declaration would have affected the jury verdict and thus, entitles them to a judgment of acquittal or new trial. *See id.* Specifically, Defendants argue that "[a]n essential element and factual predicate for each offense charged was that [Teleco] was a Haitian State owned instrumentality, and thus the individuals employed at [Teleco] were Haitian government officials whom the [sic] Esquenazi and Rodriguez allegedly bribed . . . ." (D.E. No. 543 at 1-2). Defendants contend that the declaration establishes that "the factual predicate for the FCPA offenses and related charges is absent and never existed." (D.E. No. 543 at 4). They also contend that the Government gave no reasons why it could not have obtained the Declaration prior to receiving it on August 9, 2011. *See* (D.E. No. 543 at 4). The Court however finds that the declaration provides no newly discovered evidence and would not have affected the jury verdict.

1.    **Receipt of Declaration**.

According to the Government, on August 9, 2011, it received a copy of the declaration,

dated July 26, 2011, from Paul Calli, who was then counsel for defendant Patrick Joseph. *See*

(D.E. No. 561 at 9).  On August 10, 2011, the Government forwarded the declaration to counsel

for Esquenazi and Rodriguez. *Id.*  Further:

> After receiving the letter from Mr. Calli, the Government reached
> out to representatives of the Haitian Government, including Mr.
> Bellerive, to ascertain the origin and purpose of the July 26th
> declaration. The Government learned that the letter was actually an
> internal document created in connection with Teleco's
> modernization and was not intended to convey a position that
> Teleco was not a government entity, as had been interpreted by Mr.
> Calli (and now Rodriguez and Esquenazi).  The Haitian
> Government reiterated the position it has held throughout the
> course of this investigation and prosecution—that Haiti Teleco was
> part of the public administration during the relevant time period.
> The Haitian Government, and Mr. Bellerive in particular, offered
> to clarify its position on this issue. As a result of those
> conversations, the Government assisted Mr. Bellerive in preparing
> the declaration attached to this response as Exhibit 1 (hereinafter,
> the "second Bellerive declaration").

(D.E. No. 561 at 9).

Defendants assert that: "[t]he documentary evidence shows that the First Declaration was

the result of a letter from counsel for Patrick Joseph, Richard Klugh, Esq. . . . requesting an

official statement from the Republic of Haiti regarding the Haitian law and status of Haiti Teleco;

not a request for a letter from anyone involved in the modernization process." (D.E. No. 581 at

4).

Thus, contrary to Defendants' claims, the Government did not receive the declaration

until August 9, 2011 and was not responsible for procuring the declaration.

2.      **Contents of Declarations.**

The first declaration provides that Téléco "is a Limited Company under common law,

founded on August 22, 1968 by private individuals under common law." (D.E. No. 581-1). It

further states that:

> The law of September 16, 1963 grants the Haitian State or any
> other State body to acquire shares in Limited Companies. Once the
> State becomes a shareholder it must obtain a change in the bylaws
> to change the Limited Company (S.A.) to Limited Mixed Company
> (S.A.M). This change is essential to allow the State to appoint its
> representatives to the Board of Directors. As far as Téléco is
> concerned, the company never underwent legal change and kept its
> old bylaws of Limited Company.
>
> . . . .
>
> Based on the foregoing, Téléco has never been and until now is not
> a State enterprise. Since its formation to date, it has and remains a
> Company under common law.

(D.E. No. 581-1).

Mr. Bellerive provided a second declaration clarifying his statements made in the first and

explaining that he:

> did not know that it was going to be used in criminal legal
> proceedings in the United States or that it was going to be used in
> support of the argument that, after the takeover by BRH [Bank of
> the Republic of Haiti] and **before its modernization, Téléco was
> not part of the Public Administration of Haiti.** This is
> obviously not the case since, during that time, Téléco belonged to
> BRH, which is an institution of the Haitian state. That document
> had been signed strictly for internal purposes and to be used in
> support of the on-going modernization process of Téléco.

(D.E. No. 581-3) (emphasis in original).

Mr. Bellerive also explained that the statements in the first declaration were truthful, but

he understands potential confusion.  He clarified that:

> The statement of July 26, 2011 explains that:
>
>> (1)  Téléco was started in 1968 as a private company;
>>
>> (2) The partial modernization of Téléco was completed in 2011; and
>>
>> (3) In the interval, no Haitian law ever established Téléco as a publicly-owned institution.
>>
>> All the facts in the July 26, 2011 statement are correct.  However, the statement can be confusing if taken in its current context since it omits the fact that, after the initial creation of Téléco and prior to its modernization, it was fully funded and controlled by BRH, which is a public entity of the Haitian state.

(D.E. No. 581-3).  The Government did assist Mr. Bellerive in preparing the second declaration. (D.E. No. 561 at 10).

Thus, this shows that Mr. Bellerive's second declaration simply clarified the contents of the first declaration.  Further, as discussed in (III)(E)(3), the contents of the first declaration were established throughout trial and were known to Defendants during trial preparation.

### 3.    Declaration Contains No Newly Discovered Evidence And Does Not Affect Jury Verdict.

As detailed in Section I(B), above, the testimony of Mr. Lissade addressed many of the points raised in the first declaration.  *See* (D.E. No. 417-B, ¶¶ 5, 16), Tr. 7/25/2011 PM pp. 38, 40-42, 68, 96.  As accurately stated by the Government in its Response in Opposition to Defendants' Joint Request for Status Conference (D.E. No. 584), the Government also produced five fact witnesses that established Teleco was an instrumentality of the Haitian government:

> • Robert Antoine testified that Teleco was a state-owned company and that, when he worked there, he was a government employee

whose supervisor, Patrick Joseph, had been appointed by the President of Haiti (Tr. 7/26/2011 AM pp. 11-12, 13, 15);

• Jean Fourcand testified that the President of Haiti appointed his cousin, Patrick Joseph, as General Director of Teleco, the "state owned" "national phone company" of Haiti (Tr. 7/21/2011 PM pp. 31-32);

• Juan Diaz testified that he learned while living in Haiti that Teleco was a "nationalized" company owned by the Haitian government (Tr. 7/19/2011 AM p. 64);

• Antonio Perez testified that Esquenazi, Terra's in-house attorney James Dickey, and Terra's Haitian business partners at HAWAI told him that Teleco was owned and operated by the Haitian government and that he saw an Aon insurance application submitted by Terra describing Teleco as a government owned entity (Tr. 7/25/2011 AM pp. 70-71); and

• John Marsha, who worked at Aon, testified that Esquenazi, Rodriguez, and Dickey told him the contract they wanted to insure was with a foreign government and that the type of insurance they requested applied only to government contracts (Tr. 7/27/2011 AM pp. 7-8).

(D.E. No. 584 at 3).

Defendants retained an expert witness but did not call him at trial. According to the pre-trial Notice of Expert Witness Disclosure, Esquenazi's expert witness was prepared to testify that, among other things:

• Teleco was established as a private company in 1968;

• The Bank of Republic of Haiti's acquisition of Teleco "did not change the nature of a corporation that is governed by civil law;"

• Teleco's "staff and employees are not public officials or public servants" and "are all under the jurisdiction of private law;"

• "neither Robert Antoine [n]or Jean Rene Duperval were officials of the government of Haiti during their employ at Teleco;" and

• "Teleco was, during the period of times in the indictment, a private entity under Haitian law."

(D.E. No. 360 at 1-2).  The evidence Defendants' claim is newly discovered by the first Bellerive declaration was known to them during trial preparation as shown in their expert witness disclosure.  Additionally, as discussed in Section I(B), Mr. Lissade testified as to many of the statements made in the first Bellerive declaration.  The Bellerive declaration contains no newly discovered evidence and would not have affected the jury verdict.  Accordingly, it is hereby:

**ORDERED AND ADJUDGED** that

1. Defendant Carlos Rodriguez's Motions for Judgment of Acquittal or New Trial (D.E. Nos. 542, 543) are **DENIED**.

2. Defendant Joel Esquenazi's Motions to Adopt Carlos Rodriquez's  Motions for Judgment of Acquittal or New Trial (D.E. Nos. 546, 547) are **GRANTED**.

3. Esquenazi's Motion to Adopt Rodriguez's Reply to Government's Response to Docket Entry Number 543 (D.E. No. 586) is **GRANTED**.

4. Joel Esquenazi and Carlos Rodriguez's Joint Request for Status Conference and Briefing Schedule (D.E. No. 566) and Carlos Rodriguez's Motion to Compel Discovery and Renewed Request for Evidentiary Hearing (D.E. No. 581) are **DENIED**.

DONE AND ORDERED in Chambers at Miami, Florida, this 12 day of October, 2011.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge McAliley
All Counsel of Record

-28-